**C. J. TOWER & SONS OF BUFFALO, INC., and Dravo Corporation**

v.

**UNITED STATES.**

C.D. 4379; Protests Nos. 69/16143–6226 and 69/16150–6233 against the decision of the district director of customs at the port of Buffalo.

United States Customs Court,
Second Division.

Sept. 22, 1972.

Glad & Tuttle, Los Angeles, Cal. (George R. Tuttle, Los Angeles, Cal., of counsel), for plaintiffs.

Harlington Wood, Jr., Asst. Atty. Gen. (Patrick D. Gill, New York City, trial attorney), for defendant.

Before RAO, FORD and NEWMAN, Judges.

FORD, Judge:

The cases listed above, consolidated for the purpose of trial, involve certain steel castings which were classified as parts of furnaces under item 661.30, Tariff Schedules of the United States, and subject to duty at the rate of 19 per centum ad valorem.

Plaintiffs contend said merchandise is properly subject to classification as parts of conveyors as provided for in item 664.10, Tariff Schedules of the United States, which provides for duty at the rate of 10.5 per centum ad valorem. Alternatively, it is the position of plaintiffs that said merchandise consists of parts of machinery which treats materials by a process involving temperature change as provided for in item 661.70, Tariff Schedules of the United States, and as such is dutiable at the rate of 12.5 per centum ad valorem.

The statutory provisions involved herein provide as follows:

Schedule 6, Part 4:

*Subpart A headnote*:

1. A machine or appliance which is described in this subpart and also is described elsewhere in this part is classifiable in this subpart.

\* \* \* \* \* \*

661.30 Industrial and laboratory furnaces and ovens, non-electric, and parts thereof .................. 19% ad val.

\* \* \* \* \* \*

Industrial machinery, plant, and similar laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature, such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing, or cooling; instantaneous or storage water heaters, non-electrical; all the foregoing (except agricultural implements, sugar machinery, shoe machinery, and machinery or equipment for the heat-treatment of textile yarns, fabrics, or made-up textile articles) and parts thereof:

\* \* \* \* \* \*

661.70 Other ................ 12.5% ad val.

\* \* \* \* \* \*

Subpart B.—Elevators, Winches, Cranes, and Related Machinery; Earth-Moving and Mining Machinery

\* \* \* \* \* \*

664.10 Elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof not provided for in item 664.05 ................ 10.5% ad val.

Plaintiffs not having pressed their additional claims in the protests, they are accordingly deemed abandoned and are therefore dismissed. Randolph Rand Corp. et al. v. United States, 52 Cust.Ct. 107, C.D. 2445 (1964), aff'd, 53 CCPA 24, C.A.D. 871 (1966).

The record consists of the testimony of three witnesses called on behalf of plaintiffs and 14 exhibits received in evidence. Plaintiffs' exhibit 14[1] for identification was not received in evidence and its admission was left for determination by the division. Said exhibit consists of a repair manual for the plant located at Black River Falls, Wisconsin. The manual is quite voluminous and contains drawings which have been testified to as reproductions of shop drawings as well as maintenance instructions. Said drawings being an accurate representation of machine shop drawings of the involved machines are admissible. However, as to the balance of the manual, it is to be noted that such evidence is not excepted from the hearsay rule. We therefore sustain the objection of defendant in part and hold exhibit 14 for identification inadmissible except as to the drawings which are admissible as an accurate representation of the machines involved.

The first witness, Mr. DeFelice, testified that the articles before the court were used at the Black River Falls plant. The next witness, Mr. Coulter, assistant chief engineer of the Dravo Corporation was familiar with the importations at bar and the conveyor in particular. The function of the pelletizing machine was described by this witness as follows:

The pelletizing machine is a special designed separate and distinct machine, which conveys a bed of pellets under a refractory-lined hood. During this time the pellets are dried, heated and cooled.

The imported articles were described as rough castings which had to be machined and subjected to further assembly work. They are parts of a pelletizing machine or conveyor utilized in a pelletizing plant whose purpose is to transform iron ore pellets by the application of heat in order to make them suitable for use in a blast furnace. The main components of the pelletizing machine are the palletes, the drive end assembly, the discharge end assembly, the lubrication systems, and the system for collecting the internal spillage on the machine. In the functioning of this conveyor, the pellets are fed into the machine and are passed underneath the furnace which subjects said pellets to

1. Erroneously marked exhibit 15.

heat. The refractory-lined hood is a furnace in the opinion of witness Coulter. The conveyor has only one use and that is to convey iron ore pellets.

Mr. Malcolm, manager of processing in the development department of the Dravo Corporation, was next called to testify on behalf of plaintiffs. The department of which he is manager deals with pelletizing, sintering, briquetting and nodulizing all of which fall under the term "agglomeration". This was described as follows:

Agglomeration principally developed to the need for making uniform sized particles for charge into a blast furnace. Initially blast furnaces were charged with high-grade lump ore, and as these reserves or deposits depleted the means were developed to take low-grade ores, and remove the unwanted components or gangue from these ores; and the methods that were required to do this involved crushing ore and grinding, which related in the final up-graded ore product being a very finely divided particle, and this particle was unsuitable for burdening a blast furnace. So the means was required to take this fine particle and create larger particles.

One method developed was sintering, and another briquetting and nodulizing. Sintering of ores was somewhat an outgrowth of an old practice of agglomerating in plant waste material. Ordinarily, sinter plants were strictly what we called garage plants, which took waste materials and agglomerated just that. But sinter was then applied to the agglomeration of fine ores and concentrates. Pelletizing was, in many respects, the successor to sintering in this country, and is the most popular means presently for agglomerating ore concentrates and fine ore mixtures.

The plant is sold as a Dravo Metallurgy Pelletizing Ore Plant and never as an industrial furnace. The application of heat in the pelletizing process was described as follows:

As the pellets move, the pelletizing or heat-hardening section requires, first, a drying portion, which is used to drive off the water which is used to form the agglomerate, a binder, essentially, with clay; and subsequent to drying, we heat the pellets to an intermediate temperature to prevent thermal shock and also to encourage the oxidation from hematite to magnetite at the most rapid rate; and then, in conjunction with this operation, the pellets are heated to a temperature in the vicinity of 2400 degrees Fahrenheit, at which time a green growth bond, or hematite bond, takes place between individual particles from the green pellet, and it is this hematite bond which gives the pellet its strength.

Subsequent to that, the pellet is cooled, to be allowed to be handled in conventional means on rubber belt conveyors.

The entire installation within a pelletizing plant is a relatively permanent unit. The conveyor is powered separately from the furnace but the hot air from the furnace is blown down through the ore and sucked down through the voids in the conveyor. These voids in the conveyor are intentionally designed to assist in this process.

Before considering the merits of this case, our attention is brought to the fact that the entries involved in the protests listed above were appraised and liquidated on the same day. Accordingly, defendant refers us to the decision of Pistorino & Co., Inc. v. United States, 65 Cust.Ct. 387, C.D. 4110 (1970), decided on rehearing, 67 Cust.Ct. 245, C.D. 4281, 333 F.Supp. 541 (1971). In view of the decision in the case of National Silver Co. v. United States, 59 CCPA ——, C.A.D. 1064 (1972), we hold the liquidation herein valid and the protests timely.

Plaintiffs' primary contention that the imported merchandise consists of parts of conveyors and as such is dutiable under item 664.10, *supra,* is based upon their position that the pelletizing machine is operated by its own source of

power, is a distinct commercial entity and not part of the furnace. Plaintiffs in addition urge the court to consider whether a refractory-lined hood, burners, supporting structures and fans fall within the common meaning of the term "industrial furnace" or are "more than a furnace."

■ The question presented is whether the imported articles are parts of furnaces. There being no question of commercial designation involved, the court must determine the common meaning of the term "furnace" based upon its own understanding of the term. United States v. O. Brager-Larsen, 36 CCPA 1, C.A.D. 388 (1948). In order to refresh its recollection of the common meaning, the court·may resort to dictionaries and other written authorities. United States v. Tropical Craft Corp., etc., 42 CCPA 223, C.A.D. 598 (1955).

A review of a number of dictionaries and other lexicographic sources indicates the following:

Webster's Third New International Dictionary of the English Language (1966, p. 923):

furnace 1: an apparatus for the production or application of heat: as a: an enclosed structure for reducing ore or melting or heat-treating metal by the application of intense heat produced typically by full combustion—compare HEARTH * * *

Funk & Wagnalls New Standard Dictionary of the English Language (1956, pp. 993, 134):

furnace, *n.* 1. A structure or apparatus containing a chamber· for heating * * *.

apparatus, *n.* 1. Any complex device or machine designed or prepared for the accomplishment of a special purpose * * *.

Knight's American Mechanical Dictionary (1872), Vol. I, p. 926:

Furnace. A chamber in which fuel is burned for the production of heat, which is directed upon an object in the vicinity, such as an ore or metal under treatment.

9 Encyclopaedia Britannica (1951), pp. 943–4:

FURNACE, METALLURGICAL. A contrivance in which metallurgical operations are carried out under the influence of heat derived either from the combustion of fuel or from the heating effect of the electric current. * * *

* * * * *

The classification of furnaces is very difficult, on account of the large number of forms in use and the looseness of the terms used in their description; perhaps the most satisfactory method is to arrange them, according to the manner in which the charge is heated * * *.

9 Encyclopaedia Britannica (1970), pp. 1039–1040:

FURNACE, METALLURGICAL. A metallurgical furnace is a structure in which a temperature in excess of 1,000° F. (537.78° C.) can be maintained without serious damage to the walls and in which one of the following operations can be performed: (1) the heating of solid pieces of metal to various temperatures in different atmospheres * * *.

* * * * *

If the charge remains in the same spot during the metallurgical operation, the furnace is called a batch furnace. If the charge moves progressively, the furnace is continuous. * * *

* * * * *

Materials and Elements of Construction.—Furnaces are built of refractory material, of heat-resisting metals and of metals cooled by air or water. * * *

* * * * *

Furnaces for Heating Solids on Hearths.—If metallic solids are heated on a hearth or on a support immediately above the hearth, the furnaces are used for annealing or heating for carburizing, quenching, drawing (tem-

pering), rolling or forging. Most of these are tube furnaces and are continuous (see ANNEALING). The charge is pushed through the furnace, either directly or while resting on trays, or is carried through the furnace on a rotating hearth. In other furnaces, the charge rests on live (driven) rollers, or on traveling chains, or on belts of woven wire. Shaking hearths and vibrating hearths also transport the charge through the furnaces. Metallic objects are also heated while suspended in furnaces. At temperatures approaching 2,300° F. (1,260° C.), strength of the means of suspension is of concern. If the furnace is continuous, tightness of the strips that cover the slot in the roof is very important.

7. Encyclopedia of Chemical Technology, Kirk-Othmer (1951), pp. 23, 25–27:

## FURNACES, FUEL-FIRED

\*　　\*　　\*　　\*　　\*

### Methods of Heating

The important methods of heating in industrial furnaces include: (a) direct firing, (b) indirect firing, (c) muffles, (d) radiant tubes or electric elements, (e) recirculation, and (f) patterned combustion or high-speed heating.

Figure 1 shows the principles involved in each of these methods. With direct firing (a), the products of combustion are in direct and immediate contact with the heating material, while with indirect firing (b), the combustion is completed in a combustion chamber before the gases come in contact with the material. Under the latter condition, the analysis of the furnace atmosphere in the heating chamber and the distribution of temperature are more uniform than is the case with direct firing. Muffles (c) surround the heating material and prevent any contact with the products of combustion. They may be constructed of heat-resistant alloy or of refractory

and may be either stationary or rotating.

\*　　\*　　\*　　\*　　\*

### Handling Methods

Continous handling of materials, the principal purpose of which is to save labor, is accomplished in heating furnaces by various methods, including: (1) pushing on rails, either direct, or in pans or trays, (2) car bottoms, batch or continuous, (3) rotary hearths, (4) chain conveyors, (5) walking beams, (6) roller hearths, (7) woven wire or cast alloy belts, (8) reciprocating hearths, and (9) rotary muffles with or without internal vanes. Some of these methods are illustrated in Figure 2. See also *Conveying.*

The choice of conveying methods depends upon the temperature, the size and shape of the pieces to be heated, the method of firing, and the relative first cost of the furnace equipment. In the metallurgical processes, where metal pieces are to be handled, the first five of the methods listed are most commonly used, while for chemicals in powder form and other small products light trays or pans may be economically handled through a roller hearth or belt-conveyor furnace, or the material may be handled directly on a reciprocating hearth or through a rotating muffle.

The common nomenclature of various articles particularly those of a technical nature, are not always reflected in dictionaries prepared for general use. Under such circumstances the court has often had recourse to more precise information ascribed to such terms. Firth Sterling, Inc. v. United States, 48 CCPA 130, C.A.D. 779 (1961); United States v. The Spiegel Bros. Corp., 51 CCPA 69, C.A.D. 839 (1964). In view of the highly technical article involved herein, it is deemed necessary to have recourse to technical sources. The following infor-

mation is contained in Chemical Engineer's Handbook (J. H. Perry ed. 1950):

## CLASSIFICATION OF FURNACES AND KILNS

This section describes the commercial apparatus and structures used for the generation and application of high temperatures. Some of these designs are used with low temperatures to carry out drying operations as described in Sec. 13. Units heated by electricity are not described here but are included in Sec. 27.

A large number of widely varying designs are used in high-temperature work, many being custom-built for a specific job. Thus a number of different classifications must be applied to cover the field as an aid in identifying which of the existing types would have features suitable for application to a processing problem.

1. According to Name. The terms "furnace" and "kiln" have a wide variance in their meaning as commonly used in different industries. The use of adjectives does not always clarify this situation, e. g., a "lime kiln" may be a vertical shaft or a rotating cylinder slightly inclined from the horizontal position. Consequently care must be exercised in the use of these and other terms in this field.

In a strict sense, a *furnace* is a chamber made of a refractory material in which heat is generated at a high-temperature level, its design involving no consideration of the use of this heat. * * *

* * * * *

3. According to Movement of Charge. The charge movement may be either *periodic* or *continuous*. In the periodic or batch type, there is no movement of the charge during the heating process. It includes heat-treating furnaces for very large items, pot furnaces, salt baths, low-capacity muffles, etc. In the continuous type, the charge moves constantly. It enters the apparatus at one point and leaves at another. The charge may be moved by a pusher, on a conveyor, in cars, by gravity, by movement of the hearth, or in a fluid stream. Pushers or conveyors are used in billet-heating furnaces.

* * * * *

## INDUSTRIAL FURNACES

* * * * *

Metallurgical Furnaces. Furnaces are used in the heat-treatment of metals such as annealing, normalizing, and "drawing" (tempering). Many specialized furnaces are designed for these purposes and may be either batch or continuous operation. The continuous furnaces may be arranged either in straight line or with circular rotating hearths. Batch furnaces may be of conventional design or specialized designs, such as rotating hearths, removable bottoms, stationary bottom, or muffle. Continuous furnaces are classified according to method of moving material, such as roller, pusher, conveyor, walking beam, and tunnel types.

The above information is, in our opinion, sufficient to establish that the conveyors of which the imported articles are parts, are in truth and in fact parts of furnaces as classified. We also note the cooling aspect does not take it outside of or make it more than a furnace.

In view of the fact that we have concluded the imported articles are parts of a furnace under item 661.30, *supra*, plaintiffs' principal claim as parts of conveyors under item 664.10, *supra*, is untenable. The imported castings cannot be classified under item 664.10, *supra* because of headnote 1 of subpart A which provides that a machine or appliance described in subpart A and also in other subparts of part 4 is classifiable under subpart A. In Costa International Corp. v. United States, 58 CCPA 48, C.A.D. 1003, 434 F.2d 1053 (1970), the court held the headnote of subpart A covered parts as well as the machine or

appliance. The court therein made the following observations:

The importer urges that Headnote 1, Subpart A, Part 4 of Schedule 6 "is not applicable to 'parts' of the machines and appliances provided for in Subpart A" and notes the Customs Court's agreement in the second quoted portion of its opinion, *supra*, that the headnote "covers only machines and appliances and not parts." While the court sets forth no reason for its conclusion on this point, the importer bases its position largely on the absence of the words "and parts thereof" after "machine or appliance" in the headnote.

* * * The term "machine or appliance" appears in the headnote, *not in item 661.70*. The question therefore is not whether parts of a "machine or appliance" are classifiable under item 661.70. Instead, it is whether the "parts thereof," which item 661.70 includes along with the specified "industrial machinery, plant and similar laboratory equipment," are precluded from constituting, in the words of the headnote, "a machine or appliance which is described" in item 661.70 of Subpart A. We think it obvious that the omission from the headnote of words specifically including *parts* of a "machine or appliance" is no indication that articles which meet the description of "parts thereof" under item 661.70 are not subject to the provisions of the headnote. [Italics quoted.]

In short, we are satisfied that the present "parts" of the "machinery" and "equipment", which meet the requirements for classification in item 661.70, are covered by the term "machine or appliance" in headnote 1. We point out that that term appears to have been selected not just for its applicability to the merchandise and parts of Item 661.70, but also to all the diverse other merchandise, and "parts thereof", described in other items in Subpart A of Part 4 of Schedule 6, to all of which the headnote applies.

The claim of plaintiff that the imported castings are more specifically provided for under item 661.70, *supra*, is controlled in view of the decision in F. L. Smidth & Company v. United States, 56 CCPA 77, C.A.D. 958, 409 F.2d 1369 (1969), wherein the following pertinent observations were made:

* * * Relative specificity is now made an express part of the legislation. The pertinent parts of General Headnote 10 read as follows:

For the purposes of these schedules

(a) * * * the provisions describing the classes of imported articles and specifying the rates of duty or other import restrictions to be imposed thereon are subject to the rules of interpretation set forth herein and to such other rules of statutory interpretation, not inconsistent therewith, as have been or may be developed under administrative or judicial rulings;

*     *     *     *     *

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically described it; but * * * [what follows not applicable].

This appears to us to mean this: if an article is determined to be clearly described in two or more items, selection of the controlling item by relative specificity is mandatory and takes precedence over other judge-evolved methods of resolving ambiguity, including resort to extrinsic aids such as legislative history.

We agree with appellant that item 661.70 does describe the instant merchandise. We do not agree it is more specific. It is not, and item 661.30 is, the item having requirements which are "more difficult to satisfy." Arthur J. Humphreys et al. v. United States, 56 CCPA 67, C.A.D. 956 [, 407 F.2d 417] (decided March 6, 1969); United States, etc. v. Simon Saw &

Steel Co. [, 51 CCPA 33, C.A.D. 834] *supra*. It is hard to imagine any article covered in 661.30 that is not also covered in 661.70, and furthermore, 661.70 embraces such articles whether or not electrically heated. Besides the heating embraced by 661.30, 661.70 embraces cooling devices. A number of functions are enumerated in 661.70, for which the furnaces and ovens of 661.30 would not be used: distilling, rectifying, sterilizing, etc.

The claims of plaintiffs under items 664.10 and 661.70, *supra*, are therefore overruled.

Judgment will be entered accordingly.