**PISTORINO & CO., INC.**

v.

**UNITED STATES.**

C.D. 4779; Court Nos. 73–10–02910, 74–9–02446.

United States Customs Court.

Nov. 29, 1978.

Doherty & Melahn, Boston, Mass. (Walter E. Doherty, Jr., Boston, Mass., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David Ostheimer, New York City, and Bruce M. Mitchell, Trial Attys., Washington, D. C., for defendant.

RAO, Judge:

This consolidated civil action involves the classification of beam cutters or beam cutting machines and parts, manufactured by "Fipi" or "Atom" of Italy, imported from 1972 to 1974 and entered at the port of Boston, Massachusetts for the account of Hudson Shoe Machinery Company. The merchandise was invoiced as Models F59, F63, F79S and G888 electro-hydraulic beam cutting machines or electro-hydraulic beam presses.

On entry, the merchandise was classified by the district director under item 678.50, Tariff Schedules of the United States as modified by T.D. 68–9, as machines not specially provided for, and parts thereof, and assessed with duty at the rate of 5 percent ad valorem.

The importer claims that the merchandise is properly classifiable under item 678.10, TSUS, as shoe machinery and parts thereof, duty free.

The pertinent statutory provisions are:

<u>Tariff Schedules of the United States</u>

<u>General Headnotes and Rules of Interpretation</u>

10. <u>General Interpretative Rules</u>. For the purposes of these schedules—

\* \* \* \* \* \* \*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

\* \* \* \* \* \* \*

Schedule 6, Part 4, Subpart H.—Other Machines

<u>Classified under:</u>

678.50  Machines not specially provided for, and parts thereof ....... 5% ad val.

<u>Claimed under:</u>

678.10  Shoe machinery and parts thereof ..................... Free

The parties have correctly stated the issue to be whether the imported merchandise, at the time of importation to the United States, belonged to a class or kind of articles chiefly used as shoe machinery; item 678.10, TSUS, being controlled by chief use.

At the onset, the court granted plaintiff's motion to incorporate the record of *C. H.*

*Powell Co. v. United States,* 63 Cust.Ct. 302, C.D. 3912 (1969), into the record of the instant case. That case involved a Pedersen Rapid Beam Cutting Press and parts imported from Denmark in 1963 and 1964.

The plaintiff's evidence, consisting of the testimony of three witnesses and the introduction of three exhibits into evidence, established that the imported merchandise is sold to shoe manufacturers, with a small proportion being sold to companies that use the beam cutters to cut waxed paper, to cut material for baseball caps, to cut felts for buffing wheels and to cut materials for baseball gloves.

The imported machines have a bed dimension ranging from 16 by 59 inches to 30 by 79 inches and cutting plates ranging from 16 by 16 by 2 inches to 20 by 20 by 3 inches. The maximum cutting pressure is 20–25 tons. To cut material on these machines, the operator places a die on the material or materials to be cut, brings the trolley or cutting beam over the die, presses two buttons and holds them while the head comes down. The head strikes the die, cutting the material and then goes away from the material so that the die can be repositioned for a further cut. The dies range in size from 12 to 24 inches and are not imported with the machines under consideration.

The brochures through which the cutting presses are advertised and sold refer to the imported merchandise as "hydraulic beam cutting press[es]" and as "the finest hydraulic cutting equipment." The brochure also states that the Atom G888 "easily handles such items as soles, foam and plush type materials." There was also testimony that the machines cut numerous materials including man-made fabrics, vinyl coated materials, cardboard and other materials of that nature, and are used to cut multiple layers of materials from single ply to 24 ply. It is plaintiff's position that the imported beam cutters are chiefly used in the shoe industry and that they constitute a class of beam cutters used as shoe machinery.

Defendant relied on the testimony of three witnesses and the introduction into evidence of seven exhibits. Its evidence tended to establish that the imported beam cutters are similar in all material respects to beam cutters manufactured in the United States and used as general purpose beam cutters, and that during the period of importation, such machines were used in many industries to cut many articles for a variety of industries, including the automotive, electronic, toy, and clothing industries. At this time, according to defendant's witnesses, the shoe industry did not use more than 50 percent of the cutting dies manufactured by the Boston Die Cutting Company and Novelty Die Corporation, both manufacturers of cutting dies for a variety of industries, including the shoe industry. Each of defendant's witnesses, with a number of years of experience in the beam cutting industry, was of the opinion that the imported beam cutters belong to a general class or kind of beam cutting machinery.

In addition, there was testimony that the imported machines could replace and be replaced by domestically manufactured beam cutters that are considered to be general purpose beam cutters.

When chief use is in dispute, it is a question of fact to be determined on the basis of positive testimony. *L. Tobert Co. v. United States,* 41 CCPA 161, C.A.D. 544 (1953). All of the pertinent facts and circumstances must be looked to to determine whether the imported machines belong to a special class or kind, commonly known as shoe machinery. *United States v. Carborundum Co.,* 536 F.2d 373, 63 CCPA 98, C.A.D. 1172, *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976); *Pistorino & Co. v. United States,* 81 Cust.Ct. ——, C.D. 4774, 461 F.Supp. 337 (1978). The factors which have been considered important in this determination include the general physical characteristics of the merchandise; the expectations of the ultimate purchasers; the channels, class or kind of trade in which the merchandise moves; the environment of the sale and the manner in which the merchandise is advertised and displayed; the use, if any, in the same manner as merchandise which defines the class; the economic

practicality of so using the import; and the recognition in the trade of this use. *See United States v. Carborundum Co., supra*; *Pistorino & Co. v. United States, supra*; and the cases cited therein.

In examining the physical characteristics of the imported merchandise, we find that there is little to set it apart from other beam cutters which are used as other than shoe machinery, that is, as general purpose beam cutters. A comparison of the brochures depicting the imported merchandise and the brochures depicting the domestically manufactured "Model M 'Hercules' Traveling Head Die Press" and the "Ormont Hydraulic Die Press" reveals more similarities than disparities. All have cutting table surfaces of approximately the same dimensions, cutting heads of approximately the same size, and all have a cutting stroke of about 4 inches. Although the cutting stroke of the imported merchandise is listed as being 3¼ inches, the significance of this difference was not demonstrated by plaintiff.

The maximum pressure of the imported machines is listed at 25 tons, that of the "Ormont Hydraulic Die Press" is listed at 30 tons and that of the "Model M 'Hercules' Traveling Head Die Press" at 25–50 tons. It was plaintiff's testimony, through its witness, Hank Kent, that a machine for cutting foam rubber would require a high tonnage pressure of 40 to 45 tons, which would be beyond the capability of the imported merchandise. However, there was testimony that the instant machines do cut foam rubber sole linings satisfactorily, and, indeed, the brochure for the G888 states that it "easily handles such items as soles, foam and plush type materials."

The evidence as to the expectations of the ultimate purchasers was sparse and can perhaps best be garnered from the method in which the machines are advertised, since generally merchandise is advertised in a manner calculated to fill or meet the expectations of potential purchasers. The brochures for the beam cutters do not refer to them as shoe machinery, nor do they allude to any particular feature of the merchandise that would distinguish it from the general class of beam cutters, or put it in a special class of beam cutters susceptible of use principally in the shoe industry. The brochures also refer to the ability of the beam cutters to handle foam and plush materials as well as soles, without limitation to those foams and plush materials used in the shoe industry.

Additionally, the Hudson F63 is also advertised in various issues of *Diemaking Diecutting and Converting,* a publication purporting to cover the diecutting field. On page 26 of the May/June, 1973 issue, the primary use areas for this machine are listed as textiles, plastics, foam goods, rubber, etc. The F59 is listed as being primarily used in footwear, textiles, and all types of multi-ply cutting. The F79S is listed as being used primarily in the garment trade, packaging, foam and plastic cutting areas. In the May/June, 1972 issue of the same periodical on page 22, the G888 is listed as being used primarily in the textiles, leather and plastics industries, with no mention being made of its use in the shoe industry. In the May/June, 1974 issue on page 16, the F63 is listed as being used primarily in the textiles, plastics, foam goods and rubber industries; the F59 is listed as being used primarily in the footwear, textiles industries as well as for all types of multi-ply cutting. Finally, the F79 is depicted as being primarily used in the garment trade, packaging, and foam and plastics cutting trades. These issues of *Diemaking Diecutting and Converting* cover the period in which the instant merchandise was imported. Since the Hudson Shoe Machinery Company provided the information about its machines for the publisher of this magazine, it is clear that it was expecting to appeal to industries other than shoe manufacturing.

The channels, class or kinds of trade through which the merchandise moved would also indicate that the machines are general purpose beam cutters. They are seen at trade shows where general purpose beam cutters are on exhibition. In factories in the United States, they are seen next

to domestically manufactured beam cutters that are admittedly general purpose beam cutters. They replace and can be replaced by domestic beam cutters that are general purpose beam cutters, and they are considered competitive with domestic beam cutters that are general purpose beam cutters.

Although plaintiff introduced evidence that more than 80 percent of the imported machines were used by the shoe industry, it did not demonstrate satisfactorily that the chief use of this class or kind of merchandise is in the shoe industry. Defendant proved, through the testimony of witnesses, that the imported beam cutters belong to a general class of beam cutters used by a variety of industries including the garment industry, toy manufacturing, craft companies, and manufacturers of baseball hats and gloves, among others, and that the use by shoe manufacturers did not exceed all other uses.

Plaintiff did not establish that the imported beam cutters were economically impractical of use other than as shoe machines. Indeed, it was the testimony of plaintiff's witnesses that some of the imported machines were sold to other than shoe manufacturers. The literature on the instant merchandise states that the cutters may be used in the garment, foam cutting, packaging and rubber industries and that the cutters may be used for "all types of multi-ply cutting." The cutters will cut any material which requires 20 to 30 tons of pressure, as will the cutters manufactured by the domestic manufacturers such as Schwabe, Ormont, Sandt and Shoen.

Considering the pertinent factors relied upon in prior cases and those which are present in this case, we conclude that the imported beam cutters are not of a special class or kind commonly known as shoe machinery. Nor does the holding of the incorporated case compel a finding in favor of plaintiff, as it can be distinguished from the case now before us. *C. H. Powell Company v. United States*, 63 Cust.Ct. 302, C.D. 3912, was decided in 1969 and involved merchandise imported in 1963 and 1964 from Denmark. The merchandise was a Pedersen Rapid Beam Cutting Press and parts therefor. The decision for the plaintiff that the merchandise was shoe machinery for tariff schedule purposes was based on a finding that plaintiff had proved a prima facie case that the imported merchandise, imported and sold solely to shoe manufacturers, was chiefly used in the manufacture of leather shoes.

The evidence before this court is that the nature of the industries to which beam cutters are sold has changed within this decade. While at one time beam cutters were used almost exclusively in the shoe industry, they are now used in a variety of industries and the use in the shoe industry does not exceed that of all other industries combined.

The issue in this case is not whether the imported merchandise is chiefly used as shoe machinery, but whether it belongs to a class or kind of machinery chiefly used as shoe machinery. In the *Powell* case, the court did not have before it any evidence of the use of similar machinery in this country at the time of importation. In the instant case, there is ample evidence that machines of the same class or kind as the imported merchandise are used in a variety of industries and that the use in the shoe industry is not the chief use. Defendant's witnesses testified to use of similar beam cutters in the automobile industry, in the garment industry, and, in fact, in all types of multiple cutting situations.

Additionally, the defense witness in *Powell* was unable to recall that he had ever seen a Pedersen Beam Cutting Press in operation. In the instant case, defendant's witnesses were familiar with the imported machines, had seen them at trade shows, had seen them in operation in factories side by side with domestically manufactured general purpose beam cutters, and were of the opinion that they were interchangeable with other machines. This testimony is sufficient to rebut a prima facie case, if one has been made out by the plaintiff.

Plaintiff relies on the holding in *Maher-App & Co. v. United States*, 57 CCPA 31,

C.A.D. 973 (1969), for the proposition that the class or kind of merchandise to be considered is not the broad, general class of merchandise, but a particular class. The merchandise being considered was twine held dutiable as twine under par. 1005(b) of the Tariff Act of 1930, as modified by GATT, T.D. 51802, rather than binding twine dutiable under par. 1622 of the same Act. In *Maher-App,* our appeals court held that where the plaintiff has not met the burden of proof of establishing that the merchandise belonged to a class or kind of twine chiefly used as binder twine having certain indispensable identifying characteristics, customs classification must be upheld. The court cited with approval the finding of the court below to the effect that:

> [I]t appears that the requisite yield of twine per pound is a major characteristic of binder twine as a class, absent which such twine will not be acceptable for the uses testified to by plaintiffs' witnesses. In short, the proper length per pound is an indispensable identifying characteristic of the class of twine known as binder twine. In light of this fact, the length of the instant twine becomes of central importance, not arising from the necessity of demonstrating that these particular shipments were used on the farm, but rather from the necessity of showing that the instant twine possesses those essential characteristics which the class possesses. In short, plaintiffs' failure of proof was in respect to showing that the instant twine belonged to the class of acknowledged binder twine . . . . [57 CCPA at 35.]

Based on the holding of *Maher-App,* it was incumbent on plaintiff to bring before the court proof of those indispensable identifying characteristics of the imported merchandise which set it apart from general purpose beam cutters and establish a special class of merchandise to which the imported machines belong. This plaintiff has failed to do. It is not enough for plaintiff to establish the chief use of the imported merchandise. *Bangor & Aroostook Railroad Co. v. United States,* 20 CCPA 96, T.D. 45724 (1932); Sturm, *A Manual of Customs*

*Law,* pages 221–22, and the cases cited therein.

In *United States v. Baltimore & Ohio R. R.,* 47 CCPA 1, C.A.D. 719 (1959), the court held that various small, after-dinner or demitasse china cups and saucers were properly classifiable as ornamental articles rather than as decorated china tableware, based on evidence which established that the merchandise had been particularly designed and marketed to appeal to those purchasers indulging in the fad of cup and saucer collection, that none of the other articles usually required for after-dinner coffee, such as creamer and sugar bowl, were imported contemporaneously, and that the merchandise was not displayed with dish sets, but rather as individual items and not in the area of the store in which dinner sets were sold. It is obvious that this case was controlled by the peculiar circumstances surrounding it. Plaintiff cannot point to similar circumstances in the instant case. The merchandise before the court is advertised with general purpose beam cutters, it is used in the same manner and in the same industries in which general purpose beam cutters are used, and plaintiff has introduced no evidence that the shoe industry is the sole market at which the merchandise is targeted. To the contrary, plaintiff has attempted to sell the beam cutters to various other industries, with some success.

In *United States v. Hudson Shipping Co.,* 49 CCPA 92, C.A.D. 802 (1962), the court considered a conveyor used to transport boxes from one section of a shoe factory to another and found that it did not constitute shoe machinery. Our appellate court found it to be no different from similar conveyors used in many other types of factories, with no features which particularly adapted it to the shoe industry. The court considered at length the legislative history of the term "shoe machinery" and concluded that Congress, in using that term, "intended to cover specialized machines particularly adapted for and used in the manufacture of shoes."

Plaintiff also attempts to rely on the 1929 *Summary of Tariff Information,* Schedule 5, page 2254, which states:

In shoe machinery are included machines for cutting and sewing shoes and for other manufacturing operations. Many of these are highly specialized.

We do not interpret this language to evidence an intent on the part of Congress that any machines for cutting and sewing shoes are included in shoe machinery. An electric scissors which cuts leather and could be used to cut the parts of a shoe would not be deemed to be shoe machinery unless the importer could show that this particular scissors, because of its particular identifying characteristics, belonged to a class or kind of scissors chiefly used as shoe machinery. Similarly, a sewing machine which would have the ability to sew the various parts of a shoe would not be classified as shoe machinery unless similar evidence was before the court.

## CONCLUSION

Plaintiff has failed to establish that the chief use of the imported beam cutters was as shoe machinery at the time of importation into the United States. The presumption of correctness attaching to the classification by customs has not been overcome, and the action is dismissed.

Judgment will enter accordingly.

Judgment for defendant.