**A. J. ARANGO, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 77–4–00665.**

United States Court of International Trade.

May 4, 1981.

Siegel, Mandell & Davidson (Herbert T. Posner, New York City, at the trial and on the brief; Allan H. Kamnitz, New York City, on the reply brief), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, Field Office for Customs Litigation, New York City (James A. Resti, New York City, at the trial and on the brief), for defendant.

MALETZ, Judge:

At issue is the proper classification of articles known as torsionally flexible couplings and rubber parts which were manufactured in West Germany and entered at the port of Tampa, Florida in December 1975.

The importations were classified under item 680.50 of the Tariff Schedules of the United States as shaft couplings and parts thereof and assessed duty at the rate of 9.5 percent ad valorem. Plaintiff contends that the importations constitute more than shaft couplings, thus precluding classification under item 680.50. Instead, plaintiff claims that the importations are properly classifiable under item 660.54 as other parts of internal combustion engines dutiable at the rate of 5 percent ad valorem.

I

The record shows the following: A shaft coupling is an article which joins two shafts together. It has two functions: (1) to con-

nect a driving machine with a driven machine; and (2) to transmit power from the driving machine to the driven machine. There are three types of shaft couplings: rigid, flexible and fluid. Flexible couplings are couplings which are designed to connect shafts that are misaligned either laterally or angularly. The imported articles are flexible couplings and are used in diesel drive, electromotor drive and hydraulic motor drive installations where the use of a rigid coupler would be inappropriate due to resonance or vibration problems.

According to plaintiff's expert witness, couplings such as the importations which are used to correct torsional vibration problems are called "vibrational dampers." In the witness' view, the ability of the imported merchandise to couple shafts together is merely incidental to what he considered its primary functions, namely to detune the natural frequency of input roughness of an engine's crank effect or torque, and to dampen its torsional vibrations.

More particularly, plaintiff's expert witness explained that the functions of detuning (changing the natural frequency of the system) and damping (absorbing the vibration energy) are necessary in diesel engines because the cylinders in the engine fire one after the other causing an intermittent or rough torque curve. This creates a torsional or twisting form of vibration which causes stress in the shafting and can cause shaft failure. Further, the uneven impulses in a diesel engine result in a natural frequency which produces a condition of resonance. This resonance builds up a large twisting amplitude which causes high stress in the shaft, the engine and the driven machine which can lead to failure.

Additionally, plaintiff's expert witness testified that the imported coupling is a torsionally flexible coupling which performs the function of a shaft coupling since it connects two shafts together. However, he added that the imported coupling is distinguishable from a shaft coupling because of its ability to convert kinetic energy into heat and thus detune the frequency and dampen the vibration in diesel and other similar engines. Thus, according to the witness, the imported coupling is a torsional soft coupling which is known as a torsional vibration damper rather than a shaft coupling.

II

In this setting, plaintiff argues that while the couplings in question do perform the mechanical function of power transmission by connecting the rotating shafts of the driving and driven machines, they are nonetheless more than a shaft coupling because their primary purpose is the reduction of torsional vibration.

In order to determine whether an article is "more than" an article included in a particular tariff provision, it is necessary to ascertain the common meaning of the term in the provision and compare it with the involved merchandise. E. g., *E. Green & Son v. United States*, 59 CCPA 31, 34, C.A.D. 1032, 450 F.2d 1396, 1398 (1971). And the meaning of a tariff provision, when not otherwise defined in the Tariff Schedules or indicated by legislative history, is the common meaning of that provision as understood in trade and commerce. E. g., *Schott Optical Glass, Inc. v. United States*, 67 CCPA ——, ——, C.A.D. 1239, 612 F.2d 1283, 1285 (1979).

Determination of the correctness of the plaintiff's contention that the imported merchandise is "more than" a shaft coupling therefore requires an initial finding as to the common meaning of the *eo nomine* provision for "shaft couplings" as that term is employed in item 680.50. What constitutes the common meaning of a tariff term is not a question of fact but rather one of law. And in making its determination as to the common meaning of a tariff provision the court may consult dictionaries, scientific authorities and other reliable sources of information. E. g., *Schott Optical Glass, supra.*

Couplings and shaft couplings are defined in various authoritative sources as follows:

Baumeister and Marks, *Standard Handbook for Mechanical Engineers*, pp. 8–50, 8–51 (7th ed. 1967):

## COUPLINGS

A coupling makes a semipermanent connection between two shafts. They are of three main types: rigid, flexible, and fluid.

\*   \*   \*   \*   \*   \*

## FLEXIBLE COUPLINGS

Flexible couplings are designed to connect shafts which are misaligned either laterally or angularly. *A secondary benefit is the absorption of impacts due to fluctuations in shaft torque or angular speed.* \* \* \* [Emphasis added.]

Carmichael, *Kent's Mechanical Engineers' Handbook*, (12th ed. 1956), pp. 15–17 et seq.:

## COUPLINGS

\*   \*   \*   \*   \*   \*

Couplings are used to join lengths of shafting, which must often be sectionalized for practicability and economy in manufacture and shipping or for purposes of ready installation. This applies to long transmission shafting, to shafts of separately built driving and driven machine units, and, on occasion, to short shafts within machines.

## 5. RIGID COUPLINGS

Rigid couplings are used to make a solid connection between shafts. They are of various types.

\*   \*   \*   \*   \*   \*

## 6. FLEXIBLE COUPLINGS

\*   \*   \*   \*   \*   \*

The ill effects of \* \* \* misalignment are commonly avoided by inserting a flexible coupling between shafts, which also lessens alignment labor. *A well-chosen flexible coupling will operate with negligible maintenance cost and power absorption and will introduce no harmful vibrations or resonances into the system.* [Emphasis added.]

\*   \*   \*   \*   \*   \*

TORSIONAL RESILIENCE. In addition to misalignment compensation, *a small degree of torsional flexibility is of-* *ten desirable in a high-speed flexible coupling in order to lessen noise and to prevent transmission of starting and running shocks to the motor or gear reducer.* This is provided in various amounts by a wide variety of couplings based on the fundamental construction of two flanges connected by resilient spring or nonmetallic elements. \* \* \* [Emphasis added.]

\*   \*   \*   \*   \*   \*

*HIGH TORSIONAL FLEXIBILITY is sometimes necessary to isolate extreme shock loads or vibration.* \* \* \* [Emphasis added.]

Audels, *New Mechanical Dictionary*, p. 287 (1960), defines flexible couplings as:

A shaft coupling used to connect two shafts in which perfectly rigid alignment is impossible; the drive is commonly transmitted from one flange to another through a resilient member, such as a steel spring, or a rubber disc or bushings.

■ From the foregoing, it is evident that the torsionally flexible coupling here in issue is merely a flexible shaft coupling which performs the function of such a coupling. In other words, the ability of the imported coupling to dampen torsional vibration and resonance is not a separate function, but is one of the normal functions of a flexible coupling. Hence, the device cannot be "more than" or "other than" a shaft coupling.

*The Way Things Work*, p. 192 (Vol. 2, 1971), an encyclopedia of technology, states that a flexible coupling has as its connection a "yielding" intermediate element which may consist of any number of flexible materials including rubber, leather or steel springs. This flexible element allows parallel and/or angular shaft movement "beside absorbing impact (shock) due to irregularities in the motion of the driving shaft" by storage or conversion of energy or both. This is precisely the function plaintiff's expert witness testified that the imported coupling performs. As explained by that witness, due to the rough or intermittent torque curve caused by the sequential firing of a diesel engine, a torsional vibra-

tion problem is created. This problem is caused by the irregular motion of the driving shaft. The imported coupling absorbs the energy in its rubber member, and converts it into heat. It is therefore nothing more than an improved type of coupling. While such merchandise may or may not have been common in the trade at the time the Tariff Schedules were adopted, an *eo nomine* designation includes all articles subsequently created which fairly come within its scope. *Hoyt, Shepston & Sciaroni v. United States*, 52 CCPA 101, 103–104, C.A.D. 865 (1965); *Davies Turner & Co. v. United States*, 45 CCPA 39, 41, C.A.D. 669 (1957).

The merchandise here undeniably consists of flexible couplings and parts of couplings and the differences claimed by plaintiff to preclude classification as such under item 680.50 are only improvements which do not alter or change its essential character. See *Robert Bosch Corp. v. United States*, 63 Cust.Ct. 96, 103–104, C.D. 3881 (1969). As this court noted in *C. T. Takahashi & Co., Inc. v. United States*, 74 Cust.Ct. 38, 41, C.D. 4583 (1975):

> In determining the applicability of an *eo nomine* designation it is well to recall that "Congress legislated for the future and is presumed to have intended to cover all forms of the article, including improved models not known in 1930." *Kaysons Import Corp. v. United States*, 56 Cust.Ct. 146, 150, C.D. 2622 (1966). See *Trans-Atlantic Company v. United States*, 471 F.2d 1397, 60 CCPA 100, C.A.D. 1088 (1973). * * *

Similarly here, the *eo nomine* designation "shaft couplings * * * and parts thereof" includes the imported merchandise, a fact clearly demonstrated by the recognized technical lexicons.[1]

*Kent's Mechanical Engineers' Handbook, supra,* pp. 15–21—15–25, classifies flexible couplings according to the following criteria: longitudinal flexibility, angular flexibility, lateral or parallel flexibility, torsional resilience, and high torsional flexibility. As previously indicated, this handbook points out that the couplings delivering high torsional flexibility are used to isolate extreme shock loads or vibration. Clearly, this is the function that the imported coupling performs.

The so-called "separate and distinct" functions of the imported coupling, which plaintiff contends make it more than a shaft coupling, are in actuality merely functions inherent in a flexible coupling, which is a type of a shaft coupling. This is not a situation in which an article performs a function separate and distinct from its primary function or is a combination of two distinct articles each provided for separately in the Tariff Schedules. *Cf.*, e. g., *Dollar Trading Corp. v. United States*, 67 Cust.Ct. 308, C.D. 4290, 349 F.Supp. 1395 (1971), *aff'd*, 60 CCPA 10, C.A.D. 1074, 468 F.2d 631 (1972). Plaintiff's expert witness testified that the imported coupling can only be used to connect a driving machine to a driven machine, albeit in a manner which isolates and dampens torsional vibration. However, the supposed "function" of damping torsional vibration is not really a function, but rather the only manner of performing the primary function of a shaft coupling to connect a driving machine to a driven machine and transmit power where torsional vibration is a problem.

The imported coupling is, therefore, merely a more sophisticated form of flexible coupling. See *Hoyt, Shepston & Sciaroni, supra.* Thus, two of plaintiff's witnesses testified that a torsionally flexible coupling is a shaft coupling,[2] and the literature groups such a coupling with shaft couplings.

---

1. The nomenclature of articles of a technical nature is not always reflected in dictionaries prepared for general use, in which case the court may consult technical sources. *C. J. Tower & Sons of Buffalo, Inc. v. United States*, 69 Cust.Ct. 105, 111, C.D. 4379, 351 F.Supp. 604, 608 (1972), *aff'd*, 61 CCPA 74, C.A.D. 1124, 496 F.2d 1219 (1974).

2. The two primary witnesses for plaintiff both admitted on cross-examination that the imported merchandise is, in fact, a shaft coupling (R. 51–62, 112). Although the testimony of witnesses is merely advisory to the court, *United States v. National Carloading Corp.*, 48 CCPA 70, 72, C.A.D. 767 (1961), such an admission is entitled to weight, particularly since one of the

In sum, plaintiff has established nothing more than the fact that the torsionally flexible coupling (and parts) imported by plaintiff is a flexible coupling (and parts thereof) —which is a type of shaft coupling. Hence, it has failed to meet its burden of proof in rebutting the presumptively correct classification of the merchandise under item 680.50 of the Tariff Schedules.

## III

It is a settled principle that plaintiff in order to prevail has a dual burden of proof. Not only must it prove that the contested classification is incorrect, it must also prove that the claim advanced on its behalf is correct. *United States v. New York Merchandise Co., Inc.*, 58 CCPA 53, 58, C.A.D. 1004, 435 F.2d 1315, 1318 (1970). Thus, even assuming that plaintiff has met its burden in establishing that the imported merchandise is more or other than a shaft coupling, and thus precluded from classification under item 680.50, it is clear that it has not met its burden in establishing its claim that the merchandise comprises other parts of internal combustion engines, classifiable under item 660.54.

With respect to this claim, plaintiff indicates—correctly—that the test mandated by General Interpretative Rule 10(ij) that merchandise is "part" of an article is whether it is chiefly or solely used as a part of the claimed article. An additional consideration, as indicated by plaintiff, is that to be classifiable as a part, the imported merchandise must serve a useful function in relation to the main article of which it is alleged to be a part. See, e. g., *Gallagher & Ascher Co. v. United States*, 52 CCPA 11, 16, C.A.D. 849 (1964). Viewed in this light, the court must conclude that the evidence of actual use adduced at the trial is insufficient to establish that the imported merchandise is either solely or chiefly used as a part of an internal combustion engine.

Plaintiff's witnesses testified that the applications of the coupling in issue are numerous and not limited to diesel engines. Although the witnesses did not quantify the variety of uses, plaintiff's expert witness testified that ten to fifteen percent of installations employing large reciprocating generators being driven by *electric motors* utilize a torsionally flexible coupling such as the one in issue. However, he did not specify the actual number of installations he had observed utilizing a torsionally flexible coupling such as the one in issue which employed *other* than internal combustion engines. He stated though that he had seen that type of coupling used in diesel engine installations a couple of hundred times. From the foregoing, it is entirely possible that installations not employing internal combustion engines accounted for a major portion of the uses of the merchandise. This is particularly true when it is considered that there is no evidence whatever to show what percentage of total use was represented by internal combustion engines. In sum, plaintiff has failed to prove that the imported couplings are chiefly used in internal combustion engines.

In any event, the use which governs is the chief use of the class of articles at or immediately prior to importation to which the imported articles belong. *United States v. Baltimore & Ohio R.R. Co.*, 47 CCPA 1, 4, C.A.D. 719 (1959). See also General Interpretative Rule 10(e)(i).[3] Chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross-section of the country. *L. Tobert & Co., Inc. v. United States*, 41 CCPA 161, 164, C.A.D. 544 (1953). See also *Pistorino & Co., Inc. v. United States*, 81

witnesses making the admission was qualified by plaintiff as an expert.

3. General Interpretative Rule 10(e)(i) provides:
   (e) in the absence of special language or context which otherwise requires—
   (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined.

Cust.Ct. 131, 133, C.D. 4779, 463 F.Supp. 1311, 1312 (1978), *aff'd*, 67 CCPA —, C.A.D. 1234, 607 F.2d 989 (1979).

The technical lexicons previously referred to, as well as the record in this case, demonstrate that the imported merchandise belongs to a class of articles known as couplings (and parts thereof). At the very least, it belongs to the class of articles known as flexible couplings (and parts thereof) and a plurality of uses other than with internal combustion engines has been established for such merchandise. Even if the class were restricted to torsionally soft flexible couplings, the record demonstrates that this merchandise is frequently used with electromotors and hydraulic motors. Indeed, plaintiff's expert witness went so far as to say that a coupling such as that represented by the imported merchandise was "commonly used" with an electric motor to drive a reciprocating compressor (R. 126).

Based on the foregoing, plaintiff has failed to prove that the chief use of the class or kind of article to which the importations belong is as other parts of internal combustion engines.

Finally, it is clear from the record that the involved merchandise is used when there is torsional vibration which must be reduced. This torsional vibration, according to the record, can arise from the intermittent torque curve of a diesel engine or can arise from the roughness of the *driven* machine, such as a reciprocating compressor or generator. Thus, the importation serves a "useful function" not only to a diesel engine, but to a reciprocating compressor. In reality, therefore, the importation is neither a part of the driving machine nor the driven machine; rather, it is a link between the driving and driven machines. Indeed, a torsionally flexible coupling is not an item necessary for a diesel engine to function as a diesel engine, but rather to aid in the performance of *one* of the applications of a diesel engine, which are numerous and diverse.

For the foregoing reasons, the action is dismissed.