**S. G. B. STEEL SCAFFOLDING &
SHORING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**C.D. 4423; Court No. 72-5-00981.**

United States Customs Court.

May 10, 1973.

Siegel, Mandell & Davidson, New York City (Allan H. Kamnitz, New York City, of counsel), for plaintiff.

Harlington Wood, Jr. Asst. Atty. Gen. (John A. Gussow, New York City, Trial Atty.), for defendant.

RAO, Judge:

The merchandise in this case consists of shore-frame systems and parts, classified as articles of iron or steel under item 657.20, Tariff Schedules of the United States, as modified, and claimed to be dutiable as jacks or lifting machinery or parts thereof under item 664.10, as modified.[1]

The pertinent provisions of the tariff schedules, as modified by Presidential Proclamation 3822 (T.D. 68-9), are as follows:

```
Articles of iron or steel, not coated or
     plated with precious metal:
         Cast-iron articles, not alloyed:
       *      *      *      *      *      *
         Other articles:
       *      *      *      *      *      *
657.20         Other ..........................11% ad val.
       *      *      *      *      *      *
664.10   Elevators, hoists, winches, cranes, jacks,
            pulley tackle, belt conveyors, and other
            lifting, handling, loading, or unloading
            machinery, and conveyors, all the fore-
            going and parts thereof not provided
            for in item 664.05 .................... 6%  ad val.
```

---

1. While eight entries were covered by the protest and are listed in the summons and the schedule attached to the complaint, plaintiff states in its brief that it "has neither included in its complaint nor adduced evidence with regard to entries 200067 and 124942 also the subject of the summons herein."

At the trial plaintiff called Robert A. O'Callaghan, managing partner of S.G.B. Epic, a company owned by O'Callaghan Bros. and S.G.B. Steel & Scaffolding; Robert M. Hiener, civil engineer, presently director of construction services for George A. Fuller Company, a general building contractor, and formerly in charge of heavy construction for Walsh Construction Company; and Richard J. Hlavac, chief engineer of S.G.B. Epic, formerly chief engineer of WACO Scaffolding & Shoring Co., a competitor. Defendant called Dr. Morris M. Fialkow, civil engineer, chief of the design branch of the New York District of the Army Engineers, and Frederick A. Petersen, president of a business association management firm which manages the Scaffolding & Shoring Institute, a trade association whose object is the development of safety information pertinent to the use of scaffolding and shoring.

According to the record presented, a shore-frame system consists of a number of components fitted and used together to shore formwork into which reinforced concrete is poured, as a temporary support until the load can sustain itself.

A shore frame is composed of two parallel poles connected by horizontal bars. Those depicted on exhibit 1 (a flyer of S.G.B. Epic) vary in height from 3 to 6 feet and in width from 2 to 4 feet. Other components are the base plate assembly, the adjustment screw assembly or bottom jack, the staff connector or upper jack, the shore staff assembly, the shore heads, and the cross braces.

Mr. Hiener described their assembly and use as follows:

Exhibit 2 [another flyer] on the back of the sheet shows a complete assembly of a shore frame system, wherein the base plates with bottom jacks are set, either on a previously poured floor below or on the ground, * * *. On top of those shore frames themselves, either one shore frame or more than one shore frame stacked on top of that, then comes the part described in here as the staff connector, on top of that then would come the shore staff assembly, and placed on top of that is the head. * * * These are assembled generally by carpenters assisted by laborers. When one frame is set up, one frame consisting of two jacks, a frame jack, staff connectors, and head, the second one is set up and the two are braced together with cross-braces connected by the cross-brace pin. On top of that then in either the U-head or flat plate is the form system. Now, the jacks at this particular stage are used to adjust to the approximate height of the floor. We will say there is, as in this room, an 18 or 20-foot ceiling, this assembly is made to approximately 18 feet from the underside of the slab. The form systems [sic] which consists of beams and joist connectors, either wood or timber or steel, is set on that. The form face, either plywood or board, is put on top of that and the form is approximately set. At this stage of the game, then, the engineers would establish the exact grade of the underside of the floor. When that grade is established then the carpenters, by the use of either or both the upper and lower jacks, adjust that form to its exact height.

Concrete is then poured. Later—from 3 to 20 days—when the concrete has acquired sufficient strength to carry its own load, the heads with the forms are lowered by either or both of the jacks and the forms are removed. The shore-frame assembly is taken off the job or used again where another slab is to be poured.

Photographs illustrating the use of the S.G.B. or similar shore-frame systems in the construction of buildings

---

Defendant has admitted that the articles covered by entries 213667, 235856, 215479, and 240881 are entireties. The remaining entries (200068 and 180732) are claimed to cover parts of the shore-frame system.

were received in evidence as collective exhibits 3 and 4. Collective exhibit 4 depicts a structure consisting of many shore frames stacked on top of each other and connected by cross braces, attaining what appears to be a considerable height.

According to plaintiff's witnesses, all of the parts are necessary to the functioning of the shore-frame system. The base is needed to spread the load at the bottom and the bottom screw assembly is necessary for the basic adjustment. The shore frame acts as the connector or a truss, a load-bearing component to transfer the load from the top through to the base. The staff connector is necessary for the final adjustment; the shore staff assembly gives a rough adjustment to start with, and the head supports the structural system carrying the form.

Mr. Hlavac stated that the system is warranted as a system. The component parts are not, and are never sold or rented exclusively as parts. The equipment is tested in its entirety and the allowable load is obtained by testing the entire tower or system.

A portion of exhibit 1 was marked in evidence as exhibit 1–A. It depicts a single-pole vertical adjustable steel shore. Mr. O'Callaghan testified that it performs the same function as the shore-frame system, but that the latter takes a greater load and is a much safer piece of equipment. Both can be used on the same job to support reinforced concrete. Four pole shores tied together would act like a shore-frame system. However, a single-pole shore, free standing, could not adequately support concrete formwork.

Mr. Hiener also stated that a single-pole adjustable shore performs the same function as the shore-frame system, but it carries considerably less load. It is not as flexible and therefore not as economical in that it has an extended height of a maximum of 16 feet, whereas by stacking shore framing, you can go up to practically any height. The use of single-pole shores is not as safe in that the bracing between them is left to field work rather than a competently designed and factory-assembled system. A single-pole shore standing alone does not offer any significant resistance to lateral forces. It does not constitute a structurally stable system. The shore-frame system, on the other hand, does resist lateral loads.

According to the witness when single-pole shores are used, they are interconnected by going from a nailer plate on one shore to another nailer plate on another shore. The devices used to brace these shores are not part of the shores themselves.

Mr. Hlavac stated that the shore-frame system and the single-pole shore perform the same function in shoring or supporting poured-in-place concrete and formwork. The advantage of the system as compared to the single-pole shore is stability and the ability to go to unlimited heights.

Mr. Petersen said that a single-pole shore is normally used, braced or attached to some other item. Unbraced single-pole shores are unsafe and illegal.

Dr. Fialkow also testified that the single-pole shore is unstable and unsafe under the action of lateral forces. He said that the shore-frame system can transmit applied horizontal forces, forces applied at the level of the forms above, and can drift them safely through the bracing system down onto the supporting floor below. Furthermore, points of support are provided along the length of the verticals so as to increase their capability for carrying axial vertical force. The single-pole shore cannot transmit horizontal forces and has a limited capability for carrying axial force. The shore-frame system can be considered as a safe system under the loads which can be expected in supporting concrete. A system of single-pole shores without auxiliary bracing would not be safe. Such shores are not stable in and of themselves and a system of them would be unstable, unsafe, and ready for collapse under the anticipated load.

According to Mr. Hiener it is normal in the construction industry to use a shore-frame system because it provides a safe, efficient, economical method of supporting a forming system or a forming structure. In his opinion, the system is a machine because "it increases a force, the force applied in the jack handle or the jacking mechanism. That can be applied by one man" to lift a portion of the forming system. The direction of the force is changed since by turning the handle horizontally the form system is raised. In his opinion the whole system is a jack or lifting device. He admitted, however, that the term "jacking device" was not commonly used in the trade to characterize a shore-frame system. That equipment is commonly referred to, bought, and sold as a shore-frame system.

Mr. Hlavac considered the system to be a machine because it utilizes mechanical advantage to raise or lower concrete forms both at the initial stages of erection and at the time of stripping the forms.

Dr. Fialkow testified that the principal function of the shore-frame system was carrying the intended load of concrete in the forms. It could perform that function without the adjustment screw assembly and the staff connector. Their purpose could be accomplished by shims or wedges. He said the floor system is required to be at a particular level and that the screw assemblies and staff connectors serve the accessory function of adjustment of the length of the axial members so as to result in the floor being at the proper level. He testified that the system was basically for carrying vertical and horizontal loads and was similar to any other framework for such purposes. He admitted that the system depicted in exhibit 2 could not perform one of its intended functions, that of extending and contracting its members, without the adjustment screws. However, he would not characterize the whole system as a machine, although it has the ability for upward and downward movement.

Mr. Petersen had never heard the shore-frame system referred to as a jack, jacking device, or jacking system. He considered the adjustment screw or jacking portion of the structural system an accessory, an opinion based on information from experts in the industry. He did not think the system was normally used for lifting but that it was used for adjusting, meaning some slight changes in plumbness. He accepted the industry definition of accessories as including the adjustment devices.

Plaintiff claims that the shore-frame system is merely an improvement over the single-pole vertical shore which was held classifiable as a machine under the Tariff Act of 1930. Acrow, Incorporated, et al. v. United States, 32 Cust.Ct. 356, Abstract 57727 (1953); Rex-Spanall, Inc. v. United States, 60 Cust.Ct. 141, C.D. 3291 (1968); Brauner & Company v. United States, 59 CCPA 24, C. A.D. 1030, 451 F.2d 646 (1971). Plaintiff concedes that the single-pole shore was not designed to resist lateral force and required auxiliary bracing, and contends that the shore-frame system was designed to overcome the shortcomings of the single-pole shore and was equivalent to four such shores tied together with the addition of another jack.

Defendant argues that the shore-frame system, while having adjustment mechanism which performs a jacking function, does not fall within the common meaning of jacks or other lifting machinery. It claims that it is more than a jack, but is rather a self-contained system providing lateral support without the need for additional bracing which the single-pole shore requires.

Under the Tariff Act of 1930, it was held in Acrow, Incorporated, et al. v. United States, *supra*, that an adjustable single-pole shore, used to raise and lower forms into which concrete was to be poured, constituted a complex combination of mechanical parts, one of the purposes of which was to lift loads, and was classifiable as a machine.

In Rex-Spanall, Inc. v. United States, *supra*, similar shores had been classified as machines under paragraph 372, Tariff Act of 1930, and were claimed to be dutiable as columns, posts or structural shapes under paragraph 312. The court held, however, that the terms "columns" and "posts" denoted articles of unitary construction and did not embrace an assemblage of mobile parts comprising a jack.

In Brauner & Company v. United States, *supra*, the court held that since the adjustable shore might be used to raise the empty wooden form before the concrete was poured therein, it was more than a mere column or post and fell within the definition of a machine, as a device consisting of two or more resistant parts, which, by predetermined intermotion, may serve to transmit or modify force or motion so as to produce some effect or do some desired work.

In a case arising under the Tariff Schedules of the United States, Laurence Myers Scaffolding Co. v. United States, 57 Cust.Ct. 333, C.D. 2809, 259 F.Supp. 874 (1966), appeal dismissed, 56 CCPA 133 (1967), bridge overhang shores, highway shores, and building shores, consisting of tubular portions placed one on top of the other, having an adjustment device or jack, were assessed with duty under item 657.20, as articles of iron or steel, not more specifically provided for. It was claimed that they were classifiable under item 652.94, as columns, pillars, posts or similar structural units. This claim was overruled on the ground that a column, pillar, or post, when ready for use, is a unitary element providing upright support to a building or structure, and that the imported merchandise, although construction equipment, was not a structural unit similar to a column, pillar, or post.

In S.G.B. Epic Co., Inc. v. United States, 70 Cust.Ct., P73/86 (1973), it was held, in view of defendant's answer to the complaint, that vertical steel shores in all material respects the same as the merchandise involved in Acrow, Incorporated, et al. v. United States, *su-pra*; Rex-Spanall, Inc. v. United States, *supra,* and Brauner & Company v. United States, *supra,* were classifiable under item 664.10, Tariff Schedules of the United States, as jacks and other lifting machinery.

The merchandise here is not the same in all material respects as the single-pole adjustable shores involved in the prior cases since it includes shore frames, cross braces, and adjustment screw assemblies as well. All of the components are required for the shore-frame system, which is welded and cannot be broken down into separate adjustable steel shores. The system includes within itself not only adjustable steel shores, but the bracing necessary to provide lateral support so that the shoring may function safely and efficiently and support the load until the concrete has hardened. The system, by means of stacking shore frames one on top of another, allows a structure to be built to any height required for supporting formwork in which concrete is poured, e. g., for floors, during the construction of a building. The jacks make necessary adjustments at the ground level and at the top but the system itself is more than a jack. It is construction equipment consisting of a self-supporting temporary structure having jacking devices to lift the heads to the proper height for holding the formwork. The other functions of the system, supporting and distributing the weight of the load, and resisting lateral forces, and its self-contained bracing which contributes stability and safety and enables a temporary structure of great height to be erected, are coequal with that of the jacks. In the single-post shores, on the other hand, the jacking function is primary, since the shore *per se* cannot safely support a load but must be braced.

■■ Plaintiff's claim that the merchandise is classifiable as a jack or lifting machine cannot be sustained since an item which is more than a certain article cannot fall within a provision for that article. United States v. The A. W. Fenton Company, Inc., 49 CCPA 45, C.

A.D. 794 (1962); Cragston Corporation v. United States, 51 CCPA 27, C.A.D. 832 (1963); United States v. Flex Track Equipment Ltd. et al., 59 CCPA 97, C.A.D. 1046, 458 F.2d 148 (1972); United States v. Acec Electric Corporation, 60 CCPA ——, C.A.D. 1091, 474 F.2d 1009 (1973). The merchandise here is more than a jack or lifting machinery.

As in Laurence Myers Scaffolding Co. v. United States, *supra*, the court is not called upon to pass on the question of whether the instant shore-frame system constitutes "other structures" or "parts of structures" within the superior heading to items 652.90–652.98, dutiable under the catchall provision, item 652.98. I note, however, that substantially similar language in heading 73.21 of the Brussels Nomenclature is intended to encompass adjustable or telescopic props and similar equipment for use in scaffolding. (Explanatory notes, vol. 2, p. 674.)

The action is dismissed. Judgment will be rendered accordingly.