The BRECHTEEN COMPANY, Plaintiff–Appellee,

v.

The UNITED STATES, Defendant–Appellant.

Appeal No. 88-1154.

United States Court of Appeals, Federal Circuit.

Aug. 19, 1988.

David O. Elliott, Barnes, Richardson & Colburn, New York City, argued for plaintiff-appellee. With him on the brief was Sandra Liss Friedman.

Kenneth N. Wolf, Commercial Litigation Branch, Dept. of Justice, New York City, argued for defendant-appellant. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, International Trade Field Office.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and SMITH, Circuit Judge.

NICHOLS, Senior Circuit Judge.

This appeal from a decision of the United States Court of International Trade, *Brechteen Company v. United States*, 677 F.Supp. 1234 (1987), requires us to determine the correct customs classification of certain collagen sausage casings imported by appellee. The competing tariff paragraphs are as follows:

1. As classified by Customs and urged by appellant United States here:
    Item 790.47 TSUS
        Sausage casings not specially provided for, whether or not cut to length.
    Item 790.45—Of cellulosic plastics materials * * *.
    Item 790.47—Other . . . . . . . . . . . 4.2 ad val.

2. As classified by the Court of International Trade:
    Item 190.58 TSUS
        Intestines, weasands, bladders, tendons, and integuments, not specially provided for, including any of the fore-

going prepared for use as sausage casings............Free

For reasons that will be shown, we agree with the Customs Service and differ with the trial court. In our view, the disputed merchandise was properly classified under Item 790.47 as "Sausage casings * * * other." Accordingly, we reverse.

### Background

The trial court found that the merchandise was produced as follows before importation, and as imported, met this description:

> The imported casings are made from collagen, which is a fibrous type of protein, common to all connective tissue, hides (skin), organs and like structures in the animal body. The evidence discloses that according to component material, sausage casings are categorized as natural if they are prepared from animal (swine) intestine. Artificial sausage casings may be produced from paper, cellulose, plastic, cotton, nylon, or polyethylene, and cannot be consumed. The collagen casings in issue are edible and while not considered "natural," are made from animal as opposed to non-animal material.

> The process of producing these collagen casings begins with cattle hide after the epidermal layer (outer portion of the skin) is removed by the tanneries. Underneath this layer lies the corium layer, which is further split in two.[1] It is the inner part of this "hide split" that is the basic raw material of these casings. The hides are then washed to eliminate the lime treatment used by the tanneries to remove the hair; if edible casings are sought the hide is treated with lime again. The hides are rewashed, placed in an acid solution to produce swelling which promotes water absorption, cut and ground into a doughy mass (slurry), diluted with water, and homogenized. The acid does not appear in the final product. The doughy mass of collagen is then extruded: pressed through a rotater to create a tube, then heat cured, and humidified. Finally, the product is cut, tied, shirred, and packaged. The production of edible casings includes the addition of glycerol (to retain moisture) and cellulose (to reduce friction).

> The process takes up to approximately three weeks to complete. These imported edible collagen casings have been manufactured since the 1950's and exported to the United States since the 1960's. It does not appear to be in dispute that this, or substantially similar methods, are the only ones in existence for producing sausage casings from cattle hide. If hide other than from cattle was used, it would also have to be split and extruded. [References to transcript pages have been omitted.]

---

[1] Corium is the layer of the mucous membrane corresponding to the dermis: the sensitive vascular layer of skin consisting of fibrous connective tissue. *Webster's Third New Int'l Dictionary* (1961).

677 F.Supp. at 1235.

There is no dispute as to these findings being, for the most part, accurate. Compare the date of first importation, however, with the description of the imported merchandise and its mode of production in *Brecht Corp. v. United States*, 25 CCPA (Customs) 9, 11, *cert. denied*, 302 U.S. 719, 58 S.Ct. 39, 82 L.Ed. 555 (1937). The parties agree the issue we must decide is one of law: which tariff item fits the merchandise so described. It is only necessary to add a *Webster's Third New Int'l Dictionary* (1966) definition of collagen:

> An insoluble fibrous protein that occurs in vertebrates as the chief constituent of the fibrils of connective tissue (as in skin and tendons) * * *.

The court also added a description of how other "natural" sausage casings under Item 190 are made: they need not concern us here except that they also involve manufacturing processes and collagen. The court referred to the involved sausage casings, however, as "artificial" and the sausage casings otherwise obtained, and concededly under Item 190.58 are "natural."

The trial court further referred to the same dictionary's definition of "integument"—

1. Something that covers or encloses.

2. An external coating or investment as * * * b. an enveloping layer, membrane, or structure.

It could have gone on to note that the same definition quotes as an example of actual use of the word "integument" an author who calls the calfskin cover of a book the book's "integument." Evidently that skin was "integument" twice: first of the animal, later of the book. Thus, the sausage casing might be integument of the sausage so far as the dictionary takes us.

### Discussion

The court's thoughtful and exhaustive discussion appears to state two propositions: (1) That Item 190.58 describes *eo nomine* the merchandise at bar in "clear meaning" or "plain language." (2) Even if, notwithstanding this, we resort to legislative history, that history here is inconclusive and unclear, and nothing can be found in it to alter or modify the import of the plain language. We take up these propositions in order, and with all respect, we show that neither of them is true.

1. It is curious that, with all the discussion we have had of late as to the impropriety of going past plain language to consider possibly contradictory legislative history, there is little discussion of how we are to recognize plain language when we see it. It certainly seems appropriate to go past our possibly subjective notions of what words mean to check against recognized dictionaries of the language. On the other hand, if words are really and truly plain, it ought not to be necessary to establish their meaning by recourse to technical or scientific dictionaries where definitions contrary to common speech may often be found. Here, a much relied on proof of the "plain meaning" argument is this: if merchandise such as the instant imports are not "integuments—prepared for use as sausage casings"—there is no known product in actual trade that would be. It appears to us, however, that one who must resort to this kind of negative inference concedes a lack of "plain meaning," the more so as it is a very weak negative inference here because the "plain language" clearly imports that the intestines,

weasands, bladders, etc., are designated under Item 190.58, even if not prepared at all, and the words "any of the foregoing prepared * * *," does not import a belief by Congress that *all* of them are in fact so prepared.

The greatest difficulty in the way of the "plain language" argument is, however, that according to the "plain language" the prepared articles, sausage casings, must also still be intestines, weasands, etc. It is certainly possible, given the differences in manufacturing techniques, that an integument may have become a new and different article, having another name, character, and use, so that it is no longer an integument, as an intermediate stage to becoming a sausage casing.

Why sausage casings from integuments via collagen are "artificial," and sausage casings from intestines, etc., are "natural," is also a disturbing fact left hanging in the air unexplained under our "plain meaning" analysis.

On the other hand, the fact that there are two TSUS items dealing with sausage casings *eo nomine*, not one, and that one applies if the other doesn't, is a fact relevant to use of "plain meaning" analysis. It suggests at once as does the "not specifically provided for" language, that Congress may have disregarded the possibility of an ambiguity because it knew that court decisions or legislative history would be available that would make interpretations easy, so it could legislate two classifications of sausage casings without making clear which was which.

None of the above is intended to show under what item the involved merchandise is properly classified. It is only intended to show that the issue is not suited to "plain meaning" analysis, and that recourse to court interpretation and legislative history thus is necessary. Otherwise, a decision by us would be largely guesswork.

2. The growing mistrust of legislative history as exemplified in committee reports has illustrations in *Hart v. United States*, 585 F.2d 1025, 218 Ct.Cl. 212 (1978), and *United States v. Canadian Vinyl Indus-*

*tries, Inc.*, 555 F.2d 806, 64 CCPA (Customs) 97 (1977). Legislative history may be viewed, as there, to be an attempt often only by staffers, in any case not by the whole Congress, to enact laws without meeting the constitutional requirements for valid legislation and without placing the material in the statute books where ordinary citizens can take guidance from them. Such mistrust has no grounds when the legislative history consists of comparing a former statute, with an amended or reenacted version, and judicial interpretation of the former statute which shows why it was changed. When Congress has thus spoken twice, comparison of its two versions is a reliable guide, not subject to the vagaries of staffers.

The Tariff Act of 1930 had a provision which remained law until TSUS superseded it in 1963. Paragraph 1755 was a free list item and it provided:

> Par. 1755—Sausage casings, weasands, intestines, bladders, tendons, and integuments, not specially provided for * * *.

Paragraph 1655 of the 1922 Act was the same. It might have been supposed that the term "Sausage casings" in that arrangement comprised all forms of the article of whatever material prepared. However, in *J.E. Bernard & Co. v. United States*, 17 CCPA (Customs) 398 (1930), a predecessor of this court held that casings for sausages, made of a "vegetable parchment" were not sausage casings under Par. 1655, quoting a dictionary definition defining sausage casings as made from the "cleaned and prepared entrails of * * * [animals]."

In *United States v. Pacific Butchers Supply Co.*, 22 CCPA (Customs) 355 (1934), the court held that silk sausage cases were not included in Free List Par. 1755 because they were not made from the cleaned and prepared entrails of animals. As the Tariff Act of 1930 had become law since the *Bernard* case, the court held that Congress had adopted and ratified the *Bernard* case interpretation.

In *Brecht*, the court had before it merchandise apparently identical with that of our present case, and made the same way,

or with variations not material. The court denied it placement on the free list citing the two previous cases above mentioned.

It drew the distinction between natural and artificial sausage casings we have already found made again in the present case, and held that the sausage cases then before it were artificial, obviously because not made from the entrails of animals. Par. 1655 under the 1922 Act, and Par. 1755 under the 1930 Act, both designated items other than entrails: not only are integuments not entrails, neither are tendons and weasands. It seems obvious that their continued presence on that list had nothing to do with their being raw material for sausage casings. Actually in *Brecht* the court referred to prior legislative history in which the sausage casings and the following group were in and out of dutiable provisions dealing with various kinds of meat products.

The CCPA of that day would seem to have in these cases allowed rather short shrift to the "plain language" doctrine and to its customs corollary: an *eo nomine* designation will include all forms of the article. *Nootka Packing Co. v. United States*, 22 CCPA (Customs) 464 (1935), which doctrine, however, as stated in *Nootka* at 470, allowed an exception for contrary legislative intent. That is probably why *Nootka* was not cited: a contrary legislative intent was considered shown.

The case of Par. 1755 is fairly typical of the way practice under the Tariff Act of 1930 developed, leading to a situation where persons not having legal training, *e.g.*, ordinary customs officers, customs brokers, or importers, could not read the Tariff Schedules with any confidence they would be held to mean what they said. This is precisely the problem the TSUS was intended to correct, as we show *infra*. It was therefore inevitable that Par. 1755 was selected as one of those that needed to be cleaned up, and the changes actually made in that paragraph must be understood and interpreted as intended for that end. The TSUS was intended to be itself revenue neutral in the numerous changes it made in the 1930 Act's classification scheme, and

nomenclature, but to afford a framework on which future changes, as *e.g.*, by trade agreements, could be hung with some confidence such changes would actually have the intended result.

The effect of the cited CCPA decisions was that not all but only some sausage casings were sausage casings within the meaning of Par. 1755. The others were not specifically provided for at all, but only by basket clauses. The TSUS revisions were two: one altered the wording of Par. 1755 to show in Item 190.58 that only some sausage casings were covered there, *i.e.*, those prepared from intestines, etc., or any of them. The other sausage casings, ignored in the 1930 Act except for the operation of a basket clause, were in TSUS also provided for *eo nomine* in Items 790.45 and 790.47, so that no one need suppose any one item covered all sausage casings.

■ The changes are manifestly for the purpose of making the free list item mean what it says, and not be a trap for the unwary. They do not overrule the case law; rather they reaffirm it. An immaterial change in a tariff paragraph does not rebut the presumption of legislative ratification based on reenactment of a provision that has been construed by a court of last resort. *United States v. D.H. Grant & Co.*, 47 CCPA (Customs) 20 (1959); *United States v. Astra Trading Corp.*, 44 CCPA (Customs) 8 (1956):

> Congress having reenacted paragraph 1428 in substantially the same language, we are not of the opinion that the addition to the enumerated exemplars of the two additional exemplars is such a modification or an indication of a contrary legislative intent as to take this case out of the general rule.

44 CCPA at 14.

For application of the legislative ratification doctrine, the CCPA considered itself a court of last resort in customs matters in view of the small number of customs cases reviewed in the Supreme Court. *Werner G. Smith Co. v. United States*, 40 CCPA (Customs) 90, 97 (1952).

■ We think and hold, therefore, in view of the foregoing, the reenactment of Par. 1755 as Item 190.58, reflected a legislative adoption of the *Brecht* case holding and its incorporation into the TSUS. The change in the treatment of sausage casings had no bearing on the *Brecht* case because it did not reflect, expressly or by implication, any intent to add to the free list any sausage casings the *Brecht* case had excluded therefrom. Rather, it reflected an intent to reword the statute so it stated the result of the *Brecht* case, but in more understandable terms.

Since the court in *Brecht* had before it for classification merchandise virtually identical in mode of manufacture abroad, and in condition as imported, with the merchandise before us, *Brecht* is authority binding on us. *South Corp. v. United States*, 690 F.2d 1368, 1 Fed.Cir. (T) 1, 215 USPQ 657 (1982). The holding in *Brecht* is that such merchandise is outside Par. 1755. We are therefore constrained to apply the doctrine of legislative ratification and thus to hold it is outside Item 190.58, by reason of which it is "other" sausage casings under Item 790.47.

The trial court cites *United States v. Canadian Vinyl Industries, Inc.*, 555 F.2d 806, 810, 64 CCPA (Customs) 97, 104 (1977), for the proposition that a "recasting" of Par. 1755 must be intended to change its meaning. Apparently a "recasting" is any change, as the extent of the one actually made is not discussed. The citation is to an opinion by the present writer, sitting by designation on the CCPA. At the page cited, it holds that an amendment to eliminate from TSUS Item 771.40 the words "and unsupported" from the item reading:

> Film, strips, and sheets, all the foregoing which are flexible and unsupported:

effected a material and broadening change despite a statement in legislative history that the deleted words were surplusage. The opinion goes on to caution against using such dubious material to overcome a clear meaning. It was a foretaste of the currently fashionable "clear meaning" doctrine, and quotes *Cass v. United States*,

417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974):

> "In resolving ambiguity we must allow ourselves some recognition of the existence of sheer inadvertence in the legislative process."

555 F.2d at 811, 64 CCPA at 105.

The amendment to Item 771.40 had a direct bearing on the issues to be decided, whereas we find in the decision under review no recognition of a need to show any logical nexus between an amendment to a statute, and the issues to be decided. By that view, any changes in a statute in course of reenacting it would destroy the utility as a precedent of any judicial decision construing the former language, however devoid of connection to one another the judicial decision and the amendment may be. Moreover, the holding in *Canadian Vinyl* deals only with apparently mistaken information supplied in legislative history: it does not say—and in view of other CCPA authority, could not have said—that any change in a statute requires disregard of any judicial decision interpreting the former statute.

It remains to consider the legislative history of the TSUS items to be construed, the part, that is, that does not reflect actual enactments by Congress or decisions construing them by a court of last resort. The TSUS had its gestation in the Customs Simplification Act of 1954, Pub.L. No. 768, 83d Cong., 2d Sess. U.S.Code Cong. & Admin.News 1954, p. 1344. The purpose of that Act was as stated in its name, and Title I, § 101, was the most important step then taken to simplify the United States Customs. It directed the Tariff Commission (now the International Trade Commission) to study all the classification laws, including the dutiable and free lists, and propose changes to make them logical in arrangement and adapted to the changes since 1930 in the kinds of merchandise imported, eliminate anomalies and illogical results, and simplify tariff classification.

This required performance of a gigantic task if it was to be done properly, and the fact it was assigned to and mostly done by, one man, Russell Shewmaker, and done extremely well, makes it a unique monument to the capabilities of the old-time United States civil servant. He had help and support by the Classification Section of the Bureau of Customs to which he had previously belonged. Hearings were required if any rate changes were to be proposed. In the event, Mr. Shewmaker found it expedient and necessary to publish tentative drafts and wait for interested parties to read them and tell him when something was wrong. Sometimes this process sufficed to identify and correct mistakes, but at other times it did not. Considering the paucity of resources, except Mr. Shewmaker, assigned full time to the task, the infrequency of error is remarkable, but its possibility is never to be disregarded when interpretation is attempted.

The Tariff Commission perfected its study and transmitted it to Congress on November 15, 1960. Besides the suggested new schedules, later called the TSUS, the submission included explanatory notes commenting on the new items, and these are properly and commonly dealt with and applied by lawyers and judges as legislative history. That on Item 190.58 read in part:

> Item 190.58 is based on paragraph 1755. The term "sausage casings" in paragraph 1755 has been construed to cover only casings made of animal integuments. In order to avoid further uncertainty, the provision has been revised.

Such a construction would be absurd, and no evidence has ever surfaced to show anyone having authority to do so ever made such a holding. The government construes it as meaning that to the Congress of that day, "integuments" meant "entrails." This would appear to be another imaginative leap. It is more rational to learn from *Cass v. United States, supra,* that in analyzing legislative history, we must never forget the possibility of a simple mistake. Despite the efforts of the dictionary to set everyone straight, the world is doubtless full of people who do not know what an "integument" is. It was not the Congress that supposed an integument was an entrail. It was just the author of that note.

If that supposition had been correct, the note would have been informative. It is absurd to attribute the mistake of one staffer—one hopes not Shewmaker—to the entire Congress, but it is equally absurd to throw out the entire legislative history, root and branch, because of one natural mistake. The note is most eloquent in what it does not say. It does not say there was any intent to overrule *Brecht*, and the note on Item 790.45 shows there was no such intent. Item 790.45 was not, at that time, divided into Items 790.45 and 790.47; however, the study said:

> Item 790.45 covers sausage casings other than those provided for in item 190.58. * * * Principal kinds of casings included are those * * * and those made from hide splittings, currently dutiable by virtue of the similitude provisions of paragraph 1559 at the same rate applicable to casings made of cellulose under paragraph 31.

In *Brecht*, the merchandise was described in the opinion as made from hide splits. Thus, it is clear the Tariff Commission advised the Congress to acquiesce in *Brecht* so far as it excluded the involved merchandise from the free list, at any rate, and to provide a new home for it in a new item.

The trial court further quotes an inexplicable passage from the S.Rep. No. 530, 89th Cong., 1st Sess. 11, *reprinted in* 1965 U.S.Code Cong. & Admin.News 3416, 3425. It appears to be hopelessly confused, but it offers no excuse for disregarding real legislative history. This committee report purports to construe the TSUS which was made law by Presidential Proclamation 3598, effective in 1963, as authorized in the Tariff Classification Act of 1962, 76 Stat. 72, Pub.L. No. 87–456. It would therefore be an attempt by a committee of Congress to usurp the function of the courts in construing what a previously enacted statute means if read as a guide to the statute itself; it was meant, however, as a mere introduction to amendments then proposed and presumably better considered. The Supreme Court only just the other day again instructed the lower courts to disregard this kind of supposed legislative history. *Pierce v. Underwood*, —— U.S.

——, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). We need therefore be concerned with it no further.

The parties have devoted much of their briefs to discussion whether "integuments" alone or as modified by the words "prepared for use as sausage casings," has a meaning such as supports the result each party contends for. We have already held it does not as a matter of plain language. We doubt if, independent of case law, it is capable of a satisfactory interpretation. The controlling case authority, *Brecht*, devotes no attention to any such issue and is, as we have noted, primarily a holding that only some, not all, sausage casings attain the free list, for reasons independent of whether they are integuments. Following the lead of *Brecht*, we disregard that issue too.

### Conclusion

The imported merchandise is dutiable under Item 790.47 as "Sausage casings * * * other." The judgment of the Court of International Trade is reversed and the cause is remanded with directions to dismiss the complaint.

REVERSED AND REMANDED.