**OMARK INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court Nos. 84–11–01595, 83–01–00028.**

United States Court of International Trade.

Aug. 31, 1988.

George R. Tuttle, P.C., Stephen S. Spraitzar, San Francisco, Cal., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch,

U.S. Dept. of Justice, New York City, James A. Curley, for defendant.

DiCARLO, Judge:

This case concerns the proper tariff classification of sprockets, drums and attached hubs, and associated parts for use in gasoline-powered chain saws. Omark Industries, Inc. (Omark) imported the merchandise from Canada and the United States Customs Service (Customs) classified it under item 681.21 of the Tariff Schedules of the United States (TSUS), as "chain sprockets, clutches, universal joints and parts thereof". Omark protested Customs' classification and asserted the merchandise is properly classifiable under item 674.70, TSUS, as a part of a "hand directed or controlled tool with a pneumatic or self-contained non-electric motor".

The Court has jurisdiction under 28 U.S. C. § 1581(a) (1982). The Court finds the merchandise is properly classifiable under item 681.21, TSUS, and affirms Customs' classification.

### The Merchandise

The imported drum and adaptor assemblies are used in gasoline-powered chain saws. The imported parts include Part No. 14027, consisting of a clutch drum or cup having a splined hub or adaptor, which is about ½ inch in length. Omark's advertisements refer to the drum as a "clutch drum," and the hub or adaptor as a "splined hub." The hub is affixed to the clutch drum by brazing. Part No. 22211 consists of the clutch drum and hub which has several castellations cut in the end for connection to an oil pump drive. Part No. 26831 consists of the clutch drum and hub, a rim sprocket for mounting on the splined hub, and a bearing which is press-fitted into the bore of the hub. A dust seal and washer are also included in Part No. 26831 but their classifications are not in issue.

Omark sells the imported merchandise to distributors or dealers, who in turn resell the merchandise as replacement parts to owners of chain saws, or sometimes to manufacturers of chain saws. The chain saw employs a centrifugal clutch consisting of a driving member and a driven member.

The driving member, which is firmly attached to the output shaft of the chain saw's engine (drive shaft), has shoes connected to a spring or other flexible means of restraint. The driven member is the clutch drum and hub.

As the drive shaft of the chain saw turns, it causes the driving member to turn. When the driving member reaches a certain speed, the shoes move outwardly under centrifugal force created by the rotational speed of the member to engage the inside of the rim of the clutch drum. The drum and hub will then turn along with the driving member under the twisting force (torque) caused by this engagement. Conversely, when the rotational speed of the driving member is reduced, the tension of the springs overcomes the lessened centrifugal force to cause the shoes to move inwardly, break contact with the rim, and disengage the clutch.

The hub, a circular projection about ½ inch in length, extends from the wall of the clutch drum. A bore hole extends through the center of the drum for the length of the hub. A plurality of ridges (splines) are spaced around the hub.

The rim sprocket is designed with a number of slots that are keyed to the spacing of the splines to allow the sprocket to be mounted on the hub. When the clutch drum is engaged, torque is transmitted from the drum to the hub, and then to the sprocket which drives the chain around a guide bar to give the saw its cutting action. Since the thickness of the sprocket is somewhat less than the length of the hub, there is a small amount of play between the sprocket and the drum wall so that the sprocket can slide a little in either direction along the axis of the hub. This helps align the sprocket with the guide bar.

The splined hub of the clutch drum of exhibit PX 2A has square indentations or castellations in its end which connect to an oil pump. When the clutch drum turns, the pump will supply oil to the chain for lubrication.

The bearing is press-fitted (or force-fitted) by an arbor press into the bore of the

hub of exhibit PX 3 and cannot be removed by hand. The bearing has an aperture at the center to permit the drive shaft to pass through. The principal function of the bearing is to allow relative motion between the drive shaft and the clutch drum. Thus, when the engine of the chain saw is idling, the clutch is disengaged and the drive shaft and driving member of the clutch are rotating while the clutch drum and hub, sprocket and chain remain stationary. Without the relative motion afforded by the bearing, the engine would have to be stopped every time it is necessary to stop the chain. The bearing also provides spacing or radial alignment between the clutch drum and drive shaft, transmits forces resulting from the cutting action of the saw to the output shaft, and supports the clutch. The clutch could not operate safely in the absence of the bearing.

Exhibit PX 3 includes a rim sprocket as part of the imported merchandise. The sprocket, when mounted on the splined hub, drives the chain to produce the saw's cutting action. The sprocket is not part of the clutch and has an identity of its own.

### Discussion

Customs classified the imported merchandise under item 681.21, TSUS:

Gear boxes and other speed changers with fixed, multiple, or variable ratios; pulleys and shaft couplings; pillow blocks; flange, take-up, cartridge, and hanger units; torque converters; chain sprockets; clutches and universal joints; all the foregoing (except parts of agricultural or horticultural machinery and implements provided for in item 666.00 and parts of motor vehicles, aircraft, and bicycles) and parts thereof (con.):

681.21 Chain sprockets, clutches, universal joints, and parts thereof....

Omark contends the parts should be classified under item 674.70, TSUS:

Hand-directed or -controlled tools with pneumatic or self-contained non-electric motor, and parts thereof;

674.70 Other....

■ Customs' classifications are presumed to be correct and the burden of proving otherwise is upon the party challenging the classification, although that party need not establish that its proposed classification is correct. The court must ascertain the correct classification, both independently and in comparison with the importer's alternative. 28 U.S.C. § 2639(a)(1) (1982); *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 787 (Fed.Cir.1988); *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 73–75, 733 F.2d 873, 876–78 (1984).

1

■ To be considered a "part," an article must be an integral, constituent, or component part, without which the article that it is joined to could not function as that article. *United States v. John A. Steer Co.,* 46 CCPA 132, 134, C.A.D. 715 (1969). The Court finds the imported clutch drums or cups in exhibits PX 1A, PX 2A, and PX 3A to be parts of a centrifugal clutch for three reasons.

First, the clutch drum is necessary for the clutch to perform its function of transmitting torque from the output shaft of the engine through the drum to the sprocket. Similarly, the clutch could not perform its other chief function of controlling the transmission of torque without the cooperation of the drum and shoes of the driving member during engagement and disengagement.

Second, Omark describes the drum in trade advertisements and engineering drawings as a "clutch drum" or "clutch cup." The Court can find no reason for Omark to designate the drum in this manner if were not in fact part of the clutch. Although Omark denied that the imported merchandise was advertised as clutch parts, or parts of a clutch system, *Plaintiff's Post–Trial Brief* at 15, Omark's advertisements in exhibits PX 4B and DX B refer to the imported merchandise as a "clutch drum" in illustrations designating the various components of the clutch and sprocket assembly.

Third, a treatise by Joseph Edward Shigley entitled *Mechanical Engineering Design* (3d ed. 1977) includes a photograph of

a centrifugal clutch showing the clutch in two parts: (1) the driving member with shoes and (2) the drum and hub. Exhibit DX E. The court may consult dictionaries, lexicon, the testimony of record and other reliable sources of information as an aid to its knowledge. *Austin Chem. Co. v. United States*, 835 F.2d 1423, 1426 (Fed.Cir. 1987). A witness for Omark, a technical consultant offered as an expert witness in the area of powered products such as chain saws and brush saws, agreed the cup or drum is part of the clutch with an exception for the adaptor or splined hub.

The Court also finds that the splined hub or adaptor is also part of the clutch. The evidence shows that it is permanently attached to the drum by a brazing operation, and is not intended to be removed. Omark sells the drum and hub as a unit, and does not sell the drum without the attached hub. The hub is an extension of the drum and serves as the means of transmitting torque from the drum to the sprocket. Without the hub, torque would not be transmitted to the sprocket and the clutch could not function. Furthermore, Shigley's treatise on mechanical engineering and design shows a drum and hub as parts of a disassembled centrifugal clutch. The hub or adaptor on each imported drum is therefore part of the clutch.

The bearing, which is press-fitted into the bore of the hub by an arbor press, is physically part of the clutch drum and cannot be removed by hand. Omark imports and sells the clutch drums of exhibit PX 3A with the bearing in place, and the bearing is obviously not intended to be removed (although it can be if special tools are employed). The bearing allows relative motion, acts as a radial spacer, and transmits cutting forces from the chain to the drive shaft. Although it does neither transmits torque nor controls the transmission of torque as do the drum and hub, the presence of the bearing is necessary for the clutch to function. The bearing is part of the clutch because it is essential to the functioning of the clutch and without the bearing the clutch would not operate.

The rim sprocket of exhibit PX 3 is a separate article that is mounted on the hub and drives the chain.

2

Omark contends Customs' classification under item 681.21, TSUS, is incorrect because the imported parts contain additional, significant, and co-equal non-clutch functions which render them "more than" clutch parts. Omark identifies eight "additional and significant non-clutch functions":

1. The imported parts perform an important support function in relation to the chain and rim sprocket.

2. The imported parts, except exhibit PX 1A, drive an oil pump which is critical to the operation of the chain saw.

3. The imported parts, except exhibit PX 1A, participate in the braking function of the chain saw.

4. The sprocket adaptor on all of the parts allows the rim sprocket and chain to align themselves during operation, a key selling point of the imported merchandise.

5. The sprocket adaptor serves the function of being a bearing carrier, which is not a clutch function.

6. The chain saw trade regards the imported merchandise as a sprocket system or part of a sprocket system, and not as a clutch part.

7. For all parts, the cost of manufacturing the adaptor prior to assembly is at least twice as much as the cost of manufacturing the drum.

8. The manufacturing of the adaptor is more extensive than that for the drum.

*Plaintiff's Post–Trial Brief* at 19–20.

■ The law provides that where an article has both a primary and an incidental function subordinate to the primary function, the primary function governs classification. *Carling Elec. Co. v. United States*, 3 Fed.Cir. (T) 109, 113, 757 F.2d 1285, 1288 (1985); *Trans–Atlantic Co. v. United States*, 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397, 1399 (1973). The question of whether a given function is secondary or co-equal is one of fact. *Carling Elec. Co.*, 3 Fed.Cir. (T) at 113, 757 F.2d at 1288,

*Englishtown Corp. v. United States*, 64 CCPA 84, 87, C.A.D. 1187, 553 F.2d 1258, 1260 (1977).

Omark claims the splined hub or adaptor supports the sprocket and chain, and that this function is co-equal to that of the clutch. To show the importance of the supporting function of the hub, Omark relies on *Pollard Bearings Corp. v. United States*, 62 CCPA 61, 63, C.A.D. 1146, 511 F.2d 568, 570 (1975), which found that an integral shaft bearing used in certain automobiles had a six inch shaft "designed and strengthened to accept the pulley-fan attachment and the increased loads created by the power transmitted to the other components, without breaking."

Even if the hub supports the sprocket and chain, the government argues this function does not equal that of the clutch's. Since the sprocket is mounted over the hub, and the chain rides on the sprocket, the hub necessarily supports these parts just as a furnace in the basement of a house supports the steam pipes or hot air ducts that channel heat from the furnace to the upper floors. The principal function of the furnace is to supply heat to the house, and only incidentally to support the pipes or ducts that rest on it because of its location in the basement. The same reasoning applies to the hub. The government also states that *Pollard Bearings Corp.* is factually distinct from the merchandise in this action. Here, there is not a shaft bearing but a small hub about ½ inch long protruding from the clutch drum, while in *Pollard* there was a shaft 12 times that size that was specially designed to take a thrust load coming from the operation of the fan, and to support the heavy loads imposed by the automobile's accessories. The hub, on the other hand, is designed to carry the sprocket and chain, which weigh only a few ounces and to absorb some forces generated by the cutting action of the saw. The principal function of the hub is to transmit torque to the sprocket and its supporting function is incidental. In *Pollard*, however, the shaft was specifically designed for its supporting function.

Testimony at trial estimated the sprocket to weigh only four or five ounces, and the chain one ounce, so that the total weight carried by the hub in supporting these parts is no more than 6 ounces, and certainly less than one pound. The Court finds the supporting function of the hub to be secondary and incidental to the clutch's principal function of transmitting torque.

The Court also finds that the alignment feature is secondary and not co-equal to the clutch's functions of transmitting torque and controlling the transmission of torque. There is a small amount of play between the sprocket and the drum wall which permits the sprocket to slide longitudinally along the splines of the hub for alignment with the guide bar. It is not necessary, however, for the sprocket to slide in order for it to align with the guide bar. The spur sprocket, as shown in exhibit DX B, is a commercial product supplied by Omark that does not slide and remains stationary when in operation. Other sprockets have been made that remain in alignment with the guide bar through careful control of dimensions during manufacture. The chain saw would function even if the sprocket and guide bar are not aligned, although there might be uneven wear if there is substantial misalignment. Since the chain saw will not operate unless the clutch transmits torque to the sprocket, the Court finds that the clutch function is vastly more important than the alignment function.

The castellations on the end of the hub of exhibit PX 2A are intended to drive an automatic oil pump which lubricates the chain while it is turning. Testimony at trial indicated that chain saw users did not accept automatic oilers when they first appeared. Many chain saws are not equipped with automatic oilers and instead use a manually operated pump. While the automatic oiler is a convenient feature, it is not essential and the chain saw will operate in its absence. Even if the automatic oiler failed to operate, the saw could still function as long as oil was supplied to the chain by hand. The Court finds the function of the splined hub of exhibit PX 2A in driving the oil pump to be one of convenience and

secondary to the clutch's primary function of transmitting torque since the saw will not operate unless torque is transmitted to the sprocket.

Omark also argues that because the cost of the hub is greater than that of the drum, the function of the hub cannot be considered incidental. The Court agrees that the function of the hub is not incidental, but rather is to transmit torque from the clutch drum to the sprocket. The Court finds that this to be a clutch function. Whatever costs Omark incurred in manufacturing the hub were for the purpose of allowing the hub to perform its clutch function, and only incidentally to perform subsidiary functions such as cooperating with the sprocket in the alignment and driving the automatic oiler.

The Court also finds the braking function to be incidental to the clutch function. The clutch drum of exhibit PX 2A cooperates in braking. This is achieved by activating a band that wraps around the outside of the rim of the drum to stop it from rotating. When the drum ceases to rotate, no torque will be transmitted to the sprocket, the motion of the chain will stop, and the saw will idle. The clutch drum does not function as a brake. The brake is the band that closes about the drum. While the rim of the drum is treated to withstand the frictional force of the brake, the clutch drum is otherwise unchanged and its function unaltered. While the brake is an important and desirable safety feature, it is not essential and the saw will operate without it. Indeed, many chain saws are not even equipped with brakes. Moreover, there are other means of achieving safety without the use of brakes. The Court finds the braking function to be secondary and not co-equal to the function of the clutch drum in transmitting torque, and controlling the transmission of torque to the sprocket.

Omark states that the collective effect of the additional functions renders the imported merchandise "more than" a clutch part, and cites in support of this proposition *C.J. Tower & Sons, Inc. v. United States*, 69 CCPA 128, 673 F.2d 1268 (1982), and *S.B.G. Steel Scaffolding & Shoring Co. v. United*

*States*, 70 Cust.Ct. 158, C.D. 4423, 361 F.Supp. 631 (1973), *aff'd*, 61 CCPA 73, C.A.D. 1123, 496 F.2d 1224 (1974).

*C.J. Tower* involved the question of whether a device to water hogs was more than a valve. In addition to the valve, the hog waterer included a watering tube, which, although operated in conjunction with a valve stem to deliver water to the hog's mouth, was not related to the function of the valve. In addition, a flow restrictor functioned to reduce the flow of pressurized water to the hog's mouth which was a completely different function from that performed by the valve. Finally, a filter screen acted in conjunction with the flow reducer to remove particles that would cause a malfunction. The court found that the "hog waterer would not function as intended without the use of these three components." *C.J. Tower & Sons*, 69 CCPA at 135, 673 F.2d at 1272. The function of the valve was therefore not essential, and "even without the valve portion of the hog waterer, the merchandise would perform its intended function of delivering a clean, flow-regulated supply of drinking water directly into an animal's mouth on demand." *Id.* at 135 n. 2, 673 F.2d at 1272 n. 2.

In contrast to *C.J. Tower*, the chain saw will not operate in the absence of the clutch function because torque will not be transmitted from the drive shaft to the clutch drum, sprocket, and chain.

In *S.B.G. Steel Scaffolding & Shoring Co. v. United States*, 70 Cust.Ct. 158, C.D. 4423, 361 F.Supp. 631 (1973), *aff'd*, 61 CCPA 73, C.A.D. 1123, 496 F.2d 1224 (1974), the court considered the classification of an imported shore frame assembly into which concrete is poured at a building or construction site. The shore frame acts "as a temporary support until the load can sustain itself." 70 Cust.Ct. at 160, 361 F.Supp. at 632. The question was whether the shore frame was "more than" a jack. The court held that it was because the shore frame included a "bracing necessary to provide lateral support so that the shoring may function safely and efficiently and support the load until the concrete has

hardened." The court found that providing lateral support for the concrete was as important as jacking or lifting.

Unlike the lateral support feature, the additional functions Omark assets for the drum or hub are clearly incidental and secondary when compared to the clutch's functions of transmitting torque and controlling the transmission of torque. None of the additional functions of the clutch drum and hub, as asserted by Omark, are as important to the operation of the chain saw as the clutch function. *See Trans–Atlantic Co. v. United States*, 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397 (1973) (single action spring hinge, which held a door in place and closed it automatically, was not "more than" a hinge because the primary function of the hinge was to hold the door in place and the door closing feature was an auxiliary feature because the door could be closed manually if the spring were removed); *Arthur J. Fritz & Co. v. United States*, 56 CCPA 67, C.A.D. 956, 407 F.2d 417 (1973) (flexible ring used in sealing a juncture between water pipes which allowed water drainage when pressure was low was not "more than" a gasket because the drainage function was incidental to the primary function of sealing); *Tridon, Inc. v. United States*, 5 CIT 167 (1983) [1983 WL 4974] (directional signal for automobile that clicked when the signal was operating was the incidental effect of opening and closing the circuit and was secondary to the visual effect and thus not "more than" a switch); *A.J. Arango, Inc. v. United States*, 1 CIT 271, 517 F.Supp. 698 (1981) (flexible shaft coupling that could absorb vibration was incidental to coupling's primary function), *aff'd*, 69 CCPA 85, 671 F.2d 484 (1982).

The Court finds that the imported merchandise is not "more than" a clutch and is classifiable under item 681.21, TSUS, as part of a clutch.

### 3

Omark also argues that item 674.70, TSUS, more specifically provides for the merchandise than item 681.21, TSUS.

Item 681.21, TSUS, provides for "chain sprockets, clutches ... and parts thereof". Since these articles are listed under the name by which they are known in commerce, item 681.21 must be considered an *eo nomine* provision for sprockets and clutches, and also for parts because "parts" are expressly mentioned. *See United States v. Bruckman*, 65 CCPA 90, 94 & n. 8, C.A.D. 1211, 582 F.2d 622, 625 & n. 8 (1978).

Omark argues the sprocket and drum are described under item 674.70, TSUS. Omark argues that item 674.70, TSUS, is a use provision because, to be classified under item 674.70, TSUS, it must be shown that the article is chiefly used as part of a tool that is hand-directed or hand-controlled, and which is pneumatic or has a self-contained non-electric motor. One of the uncontested facts agreed is that "the imported merchandise is chiefly used in hand-directed or -controlled tools with pneumatic or self-contained non-electric motor." Pre–Trial Order, schedule C, ¶ 11.

In the absence of legislative intent to the contrary, a product that is described by both a use provision and an *eo nomine* provision with equal specificity is generally more specifically provided for under the use provision. *United States v. Siemens Am., Inc.*, 68 CCPA 62, 70, 653 F.2d 471, 478 (1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982); *United States v. Simon Saw & Steel Co.*, 51 CCPA 33, 39–40, C.A.D. 834 (1964); *United States v. Electrolux Corp.*, 46 CCPA 143, 147–48, C.A.D. 718 (1959); *Eastalco Aluminum v. United States*, 11 CIT ——, Slip Op. 86–96 at 3 (1986).

The Court finds that item 674.70, TSUS, which covers "hand-directed tools ... other" is a not a use provision, but rather a general descriptive provision. The adjective "hand-directed" does not suggest a use. The general descriptive nature of item 674.70, TSUS, is apparent when compared to item 674.60, TSUS, which is a use provision covering "tools suitable for metal-working".

The rule to be applied is that where an article is provided for specifically under one item, and as a part of an article in another item, "[a] provision for 'parts' of an article covers a product solely or chiefly

used as a part of such article, but does not prevail over a specific provision for such part." General Interpretative Rule 10(ij), TSUS. The *Tariff Classification Study Submitting Report* explains that at the time the report was submitted in November of 1960, there was much uncertainty in connection with the tariff treatment of parts of articles:

> In some instances, a mere provision for "parts" prevails over much more specific descriptions in the tariff schedules. Even certain "universal" components such as nuts, bolts, screws, and so forth, are sometimes classified as parts of a particular article according to their type and specific uses. In the proposed schedules, specific provision is made for the more usual components of articles. Under the rule expressed in headnote 10(ij), these specific provisions will prevail over a mere provision for "parts" of a particular article.

*Tariff Classification Study Submitting Report* 19 (Nov. 1960). The *Tariff Classification Study Submitting Report* is part of the legislative history of the TSUS. *See Brechteen Co. v. United States*, 854 F.2d 1301, 1306 (Fed.Cir.1988); *Rifkin Textiles Corp. v. United States*, 54 CCPA 138, 141, C.A.D. 925, *cert. denied*, 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967).

Under Rule 10(ij), a "specific provision for such part" prevails over a provision for parts of an article. Item 681.21 is a specific provision for sprockets and clutches because it refers to them by name. *See Norman G. Jensen, Inc. v. United States*, 77 Cust.Ct. 9, 21 C.D. 4668 (1976).

In a similar case, parts of clutches for winches which in turn were parts of tractors were classified as parts of clutches. The importer claimed the merchandise should have been classified as parts of winches or parts of tractors. The court found General Interpretative Rule 10(ij) controlling, and ruled that parts of clutches was more specific than parts of winches or parts of tractors. In concluding that the merchandise was properly classified, the court stated:

The competing provisions here are item 680.54 which covers clutches and parts and item 664.10 which covers winches and parts. General Interpretative Rule 10(ij), *supra*, provides that a provision for "parts" of an article does not prevail over a specific provision for such part. Under this rule the clutches involved herein would be classifiable under item 680.54 even though they were parts of winches....

[I]t is much more logical to hold that since clutches which are parts of winches are classifiable under the specific provision for "clutches" rather than as parts of winches, clutch parts are classifiable under the provision for parts of clutches rather than as parts of winches. Such parts do not become parts of winches until they are first parts of clutches. Where a particular part of an article is provided for specially, *eo nomine*, and must be classified under that provision regardless of whether it is a part of the whole, a part of that particular part is more specifically provided for as a part of the part than as a part of the whole.

In our view General Interpretative Rule 10(ij) was intended to prevent a circuity of construction which would hold parts of a winch clutch to be classifiable as parts of a tractor.

*Liebert v. United States*, 60 Cust.Ct. 677, 684–88, C.D. 3499 (1968). Citing the *Tariff Commission Submitting Report*, the court affirmed the classification of the merchandise as parts of clutches rather than as parts of winches or parts of tractors.

Omark contends that *Liebert* incorrectly applied Rule 10(ij) because there was no "specific" provision at issue, and Rule 10(ij) is a relative specificity rule that applies only where there is a competing "parts" provision and a competing "specific" provision. Omark contends the *Liebert* court should have instead applied General Interpretative Rule 10(c), TSUS, which provides that "an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it." Likewise, Omark urges this Court to apply Rule 10(c).

Even assuming that Rule 10(c) governs, the court finds the merchandise to be described in item 681.21, TSUS, more specifically than in item 674.70, TSUS. Item 674.70 covers a broad range of articles and their parts. A tool is defined as an implement, instrument, or utensil held in the hand and used for cutting, hitting, digging, rubbing, etc., such as knives, saws, hammers, shovels, rakes, etc. *See Webster's New World Dictionary* 1498 (2d ed. 1972). The only limitations imposed by item 674.70 are that the tool be hand-directed or hand-controlled, and be operated by a pneumatic or self-contained non-electric motor. There is also a huge number of parts that make up these tools. As one example, the parts list for a chain saw in exhibit PX 11B lists 313 separate parts, including filters, springs, gears, washers, gaskets, handles, brackets, studs, pins and a housing. The number and variety of parts which comprise the tools described by item 674.70, TSUS, vastly exceed those that comprise a clutch or a sprocket. The Court finds the requirements of item 674.70, TSUS, to be easier to satisfy than those of a sprocket or clutch. *See F.L. Smidth & Co. v. United States*, 56 CCPA 77, 85, C.A.D. 958, 409 F.2d 1369, 1376 (1969); *Humphreys v. United States*, 56 CCPA 67, 71, C.A.D. 956, 407 F.2d 417, 420 (1969). The Court also finds that item 681.21, TSUS, describes the imported merchandise with the greatest specificity. *See Korody–Colyer Corp. v. United States*, 66 Cust.Ct. 337, 340 C.D. 4212 (1972) (nozzles used as parts of fuel injection pumps incorporated into engines were properly classified as parts of pumps rather than as parts of engines); *Foster Wheeler Corp. v. United States*, 61 Cust.Ct. 166, 176–78, C.D. 3556, 290 F.Supp. 375, 383–84 (1968) (parts of converters were properly classifiable as parts of converters rather than parts of machines).

### Conclusion

Upon examination of the imported merchandise and other exhibits, and consideration of the expert testimony at trial and authoritative technical and lexicographic sources, the Court finds that the presumption of correctness under 28 U.S.C. § 2639 (1982) has not been rebutted, and that Customs properly classified the imported merchandise as "chain sprockets, clutches, universal joints and parts thereof," under item 681.21, TSUS.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with that decision,

IT IS HEREBY ORDERED that this action is dismissed.